IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMSC-004

Filing Date: January 24, 2011

Docket No. 32,197

STATE OF NEW MEXICO ex rel. GARY K. KING,
Attorney General of the State of New Mexico,

      Petitioner,

v.

PATRICK H. LYONS, Commissioner of Public Lands,

      Respondent.

ORIGINAL PROCEEDING

Gary K. King, Attorney General
Seth T. Cohen, Assistant Attorney General
Santa Fe, NM

for Petitioner

Robert Allen Stranahan, IV
Santa Fe, NM

Peifer, Hanson & Mullins, P.A.
Charles R. Peifer
Lauren Keefe
Albuquerque, NM

for Respondent

Montoya Law, Inc.
Dennis William Montoya
Albuquerque, NM

for Amicus Curiae
League of United Latin American Citizens

1

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Patrick J. Rogers
Nathan T. Nieman
Albuquerque, NM

for Amici Curiae
Easter Seals El Mirador and Union Pacific Railroad Company

Alvin Rey Garcia
Albuquerque, NM

Michael A. Saul
Boulder, CO

for Amici Curiae
New Mexico Wildlife Federation and National Wildlife Federation

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward Ricco
Jocelyn C. Drennan
Albuquerque, NM

K. Lee Peifer
Albuquerque, NM

for Amicus Curiae
University of New Mexico

Cuddy & McCarthy, LLP
John F. Kennedy
Santa Fe, NM

for Amicus Curiae
New Mexico School for the Blind and Visually Impaired

## OPINION

**BOSSON, Justice.**

**{1}** The Attorney General of New Mexico petitions this Court, for a Writ of Mandamus, requiring the New Mexico Commissioner of Public Lands (Land Commissioner) to comply with the New Mexico Enabling Act and the New Mexico Constitution, and thus to cancel or discontinue four separate land exchanges of considerable size and complexity. These exchanges would transfer or have transferred state trust land in the White Peak area of Mora

2

and Colfax counties and elsewhere to private ownership in return for certain private land situated in the same area and elsewhere. According to the Land Commissioner, these exchanges will reduce "checkerboard" ownership of state trust land and consolidate state land into larger, contiguous parcels, thereby improving land management and reducing boundary and access issues that have arisen in that area. *See, e.g.*, *State ex rel. King v. UU Bar Ranch Ltd. P'ship*, 2009-NMSC-010, ¶¶ 17-18, 63, 145 N.M. 769, 205 P.3d 816.

**{2}** This Opinion does not pass judgment on either the wisdom or the efficacy of the Land Commissioner's proposed exchanges. Instead, we are asked only to determine whether those exchanges are lawful. Specifically, we inquire whether these exchanges are legally authorized under New Mexico's Enabling Act, a 1910 act of Congress that, among other things, identified public lands for transfer to the state and imposed certain conditions. In our state constitution, the people of New Mexico expressly consented to the provisions of the Enabling Act. *See* N.M. Const. art. XXI, § 9. We conclude that the exchanges are not authorized because they violate the requirements of the Enabling Act, and therefore we issue our Writ of Mandamus in the manner requested by the Attorney General, directing the Land Commissioner to cancel these exchanges. We also give certain additional directives as indicated in this Opinion.

## BACKGROUND

### I. New Mexico Enabling Act and History of State Trust Land Exchanges

**{3}** The 1910 Enabling Act provided for New Mexico's admission as a state into the federal union and set forth certain basic conditions for statehood. Act of June 20, 1910, ch. 310, §§ 1-18, 36 Stat. 557 (Enabling Act); N.M. Const. art. XXI, § 9 (adopting the provisions of the Enabling Act). The Act was adopted during New Mexico's constitutional convention, making it "fundamental law to the same extent as if it had been directly incorporated into the Constitution." *Lake Arthur Drainage Dist. v. Field*, 27 N.M. 183, 190, 199 P. 112, 115 (1921).

**{4}** The Enabling Act required that the people of New Mexico incorporate its mandates into the state constitution, and it specified that those mandates could not be modified without the consent of Congress and a ratifying vote of our citizens. *See* Enabling Act § 2; *see also* N.M. Const. art. XXI, §§ 1-11 (incorporating all Enabling Act measures into the New Mexico Constitution and making the Act irrevocable without the consent of the United States and the people of this State); N.M. Const. art. XIX, § 4 (providing for citizen voting on constitutional amendments); *Bryant v. Bd. of Loan Comm'rs*, 28 N.M. 319, 329, 211 P. 597, 601 (1922) ("Congress contemplated that any change . . . to the use of the proceeds of the lands granted to the state should be effectuated by amendment to the Constitution, and the Constitution . . . provides that the ordinance accepting these grants of land is to be irrevocable without the consent of the United States and the people of the state, and . . . any change in the use and application of the proceeds of these land grants may . . . be done by way of a constitutional amendment.").

3

**{5}** Section 10 of the Enabling Act governs state trust land management. The Act granted over thirteen million acres of federal land to the State of New Mexico, to be held in trust for the benefit of various public schools and other institutions. *See* Enabling Act §§ 6-7, 10; 1990 WL 110523 (Cong. Rec.), 136 Cong. Rec. 21,234 (1990) (statement of Sen. Pete Domenici); *United States v. Ervien*, 246 F. 277, 277 (8th Cir. 1917). Our state constitution created the office of Commissioner of Public Lands, vesting it with the "direction, control, care and disposition of all public lands, under the provisions of the acts of congress relating thereto and such regulations as may be provided by law." N.M. Const. art. XIII, § 2. This Court has long acknowledged that the Land Commissioner's broad authority to manage state trust lands is subject to the terms of the Enabling Act. *See, e.g.*, *Burguete v. Del Curto*, 49 N.M. 292, 295-96, 163 P.2d 257, 259 (1945) (per curiam) ("It's well settled in New Mexico that under the Enabling Act, our Constitution and the statutes based thereupon, the Commissioner of Public Lands has complete dominion, which is to say complete control, over state lands. This 'dominion' is, of course, subject to the restrictions imposed by the Enabling Act, the Constitution, and the statutes, and the manner of its exercise is subject to review by the courts." (citations omitted)).

**{6}** Section 10 of the Enabling Act defines the Land Commissioner's power to sell or lease state trust land, but also limits those powers. Sale proceeds are deposited in the Land Grant Permanent Fund and invested by the State Investment Officer for the benefit of enumerated public institutions. *See* N.M. Const. art. XII, §§ 2, 7; NMSA 1978, §§ 6-8-1 to -22 (1957) (amended 2010); NMSA 1978, § 19-1-17 (1957) (amended 2010); *State v. Llewellyn*, 23 N.M. 43, 70, 167 P. 414, 423 (1917). Proceeds from leases are distributed directly to the beneficiary institutions. NMSA 1978, §§ 19-1-11, -13 (1989).

**{7}** Section 10's conditions include the proviso that state trust lands "shall be by the said state held in trust, to be disposed of in whole or in part *only in manner as herein provided.*" (Emphasis added.) When adopted, the only means of disposal provided in the Enabling Act were sale and lease, under certain conditions. The Act provided that land "shall not be sold or leased, in whole or in part, except to the highest and best bidder at a public auction" with detailed advance notice to the public. Section 10 further provides that "[a]ll lands . . . before being offered shall be appraised at their true value, and no sale or other disposal thereof shall be made for a consideration less than the value so ascertained, nor in any case less than the minimum price hereinafter fixed . . . ." These conditions, crucial to our later discussion in this Opinion, can be summarized as follows: first, disposals of land are limited to the disposals described in the Enabling Act; second, land can only be sold or leased at a public auction to the highest and best bidder; and third, all sales and leases must yield at least the appraised value of the land. As will be discussed more fully in this Opinion, the Enabling Act imposed its conditions and restrictions upon the Land Commissioner's authority to dispose of public lands so as to prevent the kind of corruption and exploitation of the public trust for private advantage that had been widely exposed over the latter part of the 19th Century.

**{8}** Over time, several attempts have been made to loosen the Enabling Act's constraints

on land disposals by amending the Act to provide the Land Commissioner with authority to *exchange* state land, for land held by others without the constraints of the conditions described above. Only once have both Congress and the people of New Mexico voted to provide the Land Commissioner with exchange authority. In 1926, Congress approved an amendment to allow the Land Commissioner and the U.S. Secretary of the Interior to exchange state trust land for national forest land. Act of June 15, 1926, ch. 590, § 1, 44 Stat. 746. New Mexico voters twice rejected the amendment before they approved it in 1932. *See* N.M. Const. art. XXI, § 11. Voters rejected another proposed amendment in 1935, which would have given the Land Commissioner broader authority to exchange land with the federal government.

**{9}** Significant to our inquiry today, in 1990 New Mexico voters overwhelmingly rejected a proposed amendment of the Enabling Act which would have provided the Land Commissioner with the very authority he seeks to exercise today. The proposed—and defeated—constitutional amendment would have authorized the Land Commissioner to exchange state trust land for land held by private persons or entities, among others. It was defeated by a vote of 57.7 percent against and only 42.3 percent in favor. As will be discussed later in this Opinion, we regard this popular vote as significant. The amendment would not have been necessary had the Enabling Act authorized exchanges all along. To the contrary, its rejection signifies that a significant majority of our electorate understood at least two things: 1) the Enabling Act did not authorize Land Commissioner exchanges, and 2) the Land Commissioner should not be empowered to conduct such exchanges.

**{10}** Despite a history of uncertainty surrounding the authority to exchange state trust land, the Land Commissioner has for decades engaged in land exchanges with a variety of state and local *public* entities involving hundreds of thousands of acres of state trust land. Land Commissioner documents submitted to this Court indicate only two exchanges have been conducted with *private* entities: a 1984 exchange of 314 acres of state trust land for 200 acres from United Nuclear Corporation and a 2009 exchange of 28 acres of state trust land for 53 acres of land from Easter Seals Santa Maria El Mirador.[1] The Attorney General has not challenged any exchanges prior to the four challenged exchanges in the present litigation, and as will be explained, this Opinion does not affect any prior exchanges.

## II.     The Four Challenged Exchanges

**{11}** In this case, the Attorney General seeks to cancel or prohibit four separate land

---

[1]The United Nuclear exchange in 1984 is the only private exchange documented in the "SLO Exchanges by Administration/Action," submitted by the Land Commissioner. That list, however, appears to only document land exchanges consummated before 1987. Attached press releases describe six land exchanges occurring between 2005 and 2009. One of those press releases suggests another private "transfer," an exchange with Easter Seals Santa Maria El Mirador on August 25, 2009.

5

exchanges, each with a private party: the "Stanley Ranch exchange," the "UU Bar exchange," the "CS Ranch Bar exchange," and the "Galloway exchange." Each exchange involves state trust lands situated in the White Peak area of Mora or Colfax counties. Combined, the exchanges would transfer 14,600 acres of state trust land, at an appraised value of $22,500,000, for approximately 9,560 acres of private land at an appraised value of $23,200,000.

**{12}** Only the Stanley Ranch exchange has been fully consummated with title passing from the state to the Stanley Ranch. The state has deeded fourteen parcels of land ranging in size from 40 to 1,727 acres, with a total of 7,205.75 acres, valued at $6,356,000. In exchange, the state has received from the Stanley Ranch multiple parcels of land, totaling 3,336.221 acres appraised at $6,413,000. The Stanley Ranch began the exchange process by submitting an "Initial Application" to the State Land Office[2] on October 11, 2007. The application specified parcels of state trust land that the Stanley Ranch sought to acquire through an exchange.

**{13}** The State Land Office agreed to proceed with the transaction on June 5, 2008, eight months after the initial application, on the condition that certain lands be added to and removed from the proposed exchange. Accordingly, Stanley Ranch completed an amended application on August 5, 2008, and submitted it to the State Land Office. On September 8, 2009, almost two years after the initial application, the State Land Office issued a "Notice of Public Auction for Exchange of Land by Sealed Bid" detailing the land sought by the Stanley Ranch. The notice was published for ten weeks, from September 18 through November 19, 2009. Stanley Ranch submitted the only bid on November 19, 2009, more than two years after its initial application, which was accepted on November 30, 2009. On January 7, 2010, the State Land Office executed an "Exchange Patent," conveying the specified state trust lands to the Stanley Ranch. The State received the specified lands from the Stanley Ranch, and the transaction was closed.

**{14}** The UU Bar Ranch exchange, not yet completed, involves three parcels of state trust land located in Mora and Colfax counties, ranging in size from 120 to 1,721 acres, totaling 3,431.34 acres and valued at $2,381,000. The Land Commissioner has agreed to transfer this land in exchange for 3,610.19 acres of the UU Bar Ranch property, also in Mora and Colfax counties, valued at $2,383,000. The UU Bar Ranch initiated the exchange on March 5, 2008, submitting an "Initial Application" for land exchange to the State Land Office. Over six months later, on October 1, 2008, the State Land Office informed the UU Bar Ranch that it "would proceed with the land exchange process" and requested further information from the UU Bar Ranch.

**{15}** On September 15, 2009, the Land Commissioner issued a "Notice of Public Auction

---

[2]NMSA 1978, Section 19-1-1 (1912), established the State Land Office, with the Commissioner of Public Lands as its executive officer.

6

for Exchange of Land by Sealed Bid," offering for auction the 3,431.34 acres of state trust land already agreed upon for exchange with the UU Bar Ranch. Notice was published for ten weeks, starting October 1, 2009. The UU Bar Ranch submitted the only bid on December 8, 2009, over a year and a half after its initial application, and was notified of its acceptance on December 17, 2009. For the moment, the State Land Office retains title to these state trust lands.

{16} The CS Ranch and Galloway exchanges have been in negotiation with the State Land Office, but have not yet proceeded to public notice. CS Ranch initiated its proposed exchange by submitting an "Initial Application" on April 9, 2008. The State Land Office responded on July 8, 2008, calling for further investigation into the exchange proposal and reporting that it had advised staff to "proceed with the exchange process." Until the Petition was filed in this case, appraisals and appraisal reviews of the targeted state trust lands were under way, and the State Land Office and CS Ranch were negotiating the details of the exchange.

{17} Under the most recent terms of the exchange, the Land Commissioner contemplates conveying approximately 166 acres of state trust land in Colfax County valued at $734,000; 3,630 acres in Santa Fe County valued at $9,935,000; and 40 acres in Bernalillo County valued at $2,250,000. In return, CS Ranch is offering 2,600 acres of its land in Colfax County valued at $13,480,000. The proposed exchange has been described by the State Land Office as part of the "White's Peak Consolidation Strategy" and "the second of four (4) proposed exchanges," focusing on consolidation and access. When the Attorney General's petition was filed on February 1, 2010, almost twenty-two months had passed since the initial CS Ranch application was filed with the State Land Office.

{18} Finally, the Galloway exchange is the fourth, and smallest, of the four exchanges. It would transfer 160 acres of state trust lands in Colfax County valued at $840,000, in exchange for approximately 110 acres of Galloway land in Colfax County valued at $951,500. On July 10, 2008, William Galloway submitted an "Initial Application" for exchange of public lands. Two months prior to his "Initial Application," Galloway proposed an exchange with the Land Commissioner, declaring his interest in "establish[ing] a dialog/consideration process for swapping certain deeded land," and promoting the exchange as a way to improve land management and public access.

{19} On August 28, 2008, the State Land Office sent Galloway a letter indicating that "further investigation of the suggested exchange [was] warranted" and that the Land Commissioner had "advised staff to proceed with the exchange process." On June 18, 2009, Galloway submitted an "UPDATED Initial Application," indicating that the state trust lands he desired were the "CS Ranch 160 acre tract . . . (part of the global swap occurring)." Galloway further explained that his interest in the land exchange was "[p]art of the global swap happening with many local owners and state of NM." The Galloway exchange had not yet been advertised when, more than eighteen months after Galloway's "Initial Application," the Attorney General filed a petition requesting that this Court stay the exchange.

7

**{20}** On February 1, 2010, the Attorney General filed a Petition for Writ of Mandamus challenging the Land Commissioner's authority to conduct the four exchanges described above. The next day, we granted the Attorney General's request to stay all transactions pending a resolution of the dispute.

## DISCUSSION

### I.      Mandamus Jurisdiction Is Proper

**{21}** This Court will exercise its original jurisdiction in mandamus

> when the petitioner presents a purely legal issue concerning the non-discretionary duty of a government official that (1) implicates fundamental constitutional questions of great public importance, (2) can be answered on the basis of virtually undisputed facts, and (3) calls for an expeditious resolution that cannot be obtained through other channels such as a direct appeal.

*State ex rel. Sandel v. N.M. Pub. Util. Comm'n*, 1999-NMSC-019, ¶ 11, 127 N.M. 272, 980 P.2d 55; *see also* N.M. Const. art. VI, § 3 ("The supreme court shall have original jurisdiction in quo warranto and mandamus against all state officers, boards and commissions . . . ."); NMSA 1978, § 44-2-5 (1884) ("The writ shall not issue in any case where there is a plain, speedy and adequate remedy in the ordinary course of law.").

**{22}** The Attorney General's petition raises questions implicating the Land Commissioner's constitutional ability to engage in land exchanges. As noted, the scope of the Land Commissioner's authority has been the subject of the Enabling Act, congressional acts, the New Mexico Constitution, state legislative initiatives, state and federal judicial opinions, and proposed constitutional amendments. The meaning of the law that created the Land Commissioner's post and established his charge, and the outcome in this case, could have far reaching implications for millions of acres of state trust land and the trust beneficiary institutions. At issue, therefore, are fundamental constitutional questions of the greatest public importance.

**{23}** This case also demands an expeditious resolution that can only come through our exercise of mandamus. The largest of the land exchanges has already been consummated, another is nearly complete, and the remaining two are in advanced stages of negotiation. Until this dispute is resolved, the legal status of thousands of acres of land, along with the property rights of the private parties involved, hang in the balance. Although the district court has concurrent jurisdiction in mandamus cases, "when issues of sufficient public importance are presented which involve a legal and not a factual determination, we will not hesitate to accept the responsibility of rendering a just and speedy disposition." *State ex rel. Bird v. Apodaca*, 91 N.M. 279, 282, 573 P.2d 213, 216 (1977); *see also State ex rel. Taylor v. Johnson*, 1998-NMSC-015, ¶ 17, 125 N.M. 343, 961 P.2d 768 (finding that a significant

and purely legal question of government-actor powers under the New Mexico Constitution would find its way to this Court, even if the action began in the district court).

**{24}** The Land Commissioner contends that alternative channels exist to challenge the exchanges, making mandamus improper. Specifically, he suggests either an administrative contest, declaratory or injunctive relief, or a challenge to the Land Commissioner's regulations under the Administrative Procedures Act. These alternatives are all inadequate.

**{25}** An administrative contest is permitted by "any persons or corporation claiming any right, title, interest or priority of claim, in or to any state lands, covered by any lease, contract, grant or any other instrument executed by the commissioner." NMSA 1978, § 19-7-64 (1912); *see also* 19.2.15.1 to .18 NMAC (6/30/2004). It also allows "[a] person aggrieved by a decision of the commissioner" to challenge any final agency action in district court. NMSA 1978, § 19-7-67 (1999). Yet the Attorney General is not personally aggrieved by the Land Commissioner's decisions, nor does he have any "right, title, interest, or priority of claim, in or to any state lands, covered by any lease, contract, grant or any other instrument executed by the commissioner." Section 19-7-64. Rather, the Attorney General is acting on behalf of state interests—state trust land and the beneficiaries of the trust—as the office requires. *See* NMSA 1978, § 8-5-2(A) (1975) ("[T]he attorney general shall . . . prosecute and defend all causes in the supreme court and court of appeals in which the state is a party or interested."); *State ex rel. Burg v. City of Albuquerque*, 31 N.M. 576, 584-85, 249 P. 242, 246 (1926).

**{26}** Declaratory judgment, although theoretically an option, does not constitute an adequate remedy at law that would preclude mandamus relief. *See City of Albuquerque v. Ryon*, 106 N.M. 600, 602-03, 747 P.2d 248-49 (1987) (providing that declaratory judgment actions are not intended to substitute for remedies such as mandamus). Finally, the Administrative Procedures Act is not a vehicle for challenge in this case because that act only applies "to agencies made subject to its coverage by law, or by agency rule or regulation if permitted by law." NMSA 1978, § 12-8-23 (1969). No laws or agency rules have been adopted making that act applicable to the State Land Office or the Land Commissioner.

**{27}** The last issue regarding our exercise of mandamus jurisdiction turns on whether the Attorney General's petition presents a purely legal question concerning a ministerial duty of the Land Commissioner. *See* NMSA 1978, § 44-2-4 (1884) ("[Mandamus] may be issued . . . to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust or station."). "A ministerial act . . . is an act or thing which [a public officer] is required to perform by direction of law upon a given state of facts being shown to exist, regardless of his own opinion as to the propriety or impropriety of doing the act in the particular case." *State ex rel. Four Corners Exploration Co. v. Walker*, 60 N.M. 459, 463, 292 P.2d 329, 332 (1956).

**{28}** We recognize that the Land Commissioner has broad discretion to manage state trust

9

lands, and mandamus cannot be used to compel an executive officer acting within his discretion. See *Bird*, 91 N.M. at 282, 573 P.2d at 216 (citing *Mitchell v. King*, 537 F.2d 385 (10th Cir. 1976)); *see also* N.M. Const. art. 5, § 1 (creating the executive department and including the "commissioner of public lands"). We have held, however, that mandamus is appropriate to determine the outer bounds of that discretion. *See, e.g.*, *State ex rel. Shepard v. Mechem*, 56 N.M. 762, 767, 250 P.2d 897, 900 (1952); *Sender v. Montoya*, 73 N.M. 287, 292, 387 P.2d 860, 863 (1963) (holding that mandamus is proper when an officer is performing ministerial duties, and explaining that "language . . ., to the effect that mandamus is inappropriate where interpretation and judgment are necessary, must be considered in context, not as an inflexible rule"), *overruled on other grounds by State ex rel. Reynolds v. Molybdenum Corp. of Am.,* 83 N.M. 690, 695, 496 P.2d 1086, 1091 (1972).

**{29}** We do not question the Land Commissioner's motivation or judgment in engaging in land exchanges. Rather, we address two specific legal questions regarding the Enabling Act's limitations on the Land Commissioner's discretion. We address each of the legal questions in turn. First, "Does the Enabling Act authorize the Land Commissioner to exchange land with private parties, without application of Section 10's sales provisions?" This is a purely legal question that we answer in the negative in Section II. We further conclude that land exchanges for monetary (appraised) value are in-kind sales and are thus subject to the Enabling Act's sales provisions.

**{30}** Because we conclude that land exchanges for monetary (appraised) value are subject to the Enabling Act's sales provisions, we move on to a second purely legal question: "As a matter of law, do the challenged exchanges comply with the required elements for a valid sale of land, including the requirement of a public auction to the highest and best bidder?" In Section III, we conclude that, as a matter of law, the exchanges do not comply with Enabling Act's Section 10 requirement that "lands shall not be sold or leased, in whole or in part, except to the highest and best bidder at a public auction." The Land Commissioner is correct that he cannot be compelled to hold a public land offering. That decision is within the Land Commissioner's discretion. If he does decide to sell (or exchange) land, however, the Land Commissioner has an enforceable, ministerial duty to comply with the sales provisions of Section 10 of the Enabling Act. He has no discretion to do otherwise.

**{31}** It is a factual determination, which we need not reach, whether making land exchanges is generally beneficial to the trust. It is also a factual determination whether the exchanges at issue would benefit the trust. The Land Commissioner makes a cogent argument supporting his conclusion that certain private land exchanges would improve the management and value of state trust lands. We accept the Land Commissioner's argument.

**{32}** This case hinges upon the meaning of the Enabling Act that created the trust and provided for its administration. Neighbor-to-neighbor exchanges may well be in the best interest of the trust, but if the Enabling Act does not provide the Land Commissioner with authority to conduct exchanges, then they cannot be done. If they are permitted, they must conform to conditions imposed by the Act.

10

## II.    The Enabling Act Does Not Permit Exchanges Unless They Are In-Kind Sales

**{33}**    This section addresses the first legal question we posed above regarding the Enabling Act's limitations on the Land Commissioner's discretion: "Does the Enabling Act authorize the Land Commissioner to exchange land with private parties, without application of Section 10's sales provisions?" We conclude that the Enabling Act does not authorize those exchanges. We also recognize, however, that exchanges for appraised monetary value, such as the challenged exchanges, may be considered in-kind sales. Thus, assuming exchanges for monetary value are in-kind sales, they are subject to the Enabling Act's sales provisions, including public auction to the highest and best bidder.

### A.    The Enabling Act's Plain Language Limits Land Disposals

**{34}**    Although Section 10 of the Enabling Act never used the word "exchange" until the word was specifically added in an amendment to give the Land Commissioner exchange power with the Secretary of the Interior, the Land Commissioner interprets the word "dispos[e]" in Section 10 as a general, implicit grant of authority beyond sales or leases to include exchanges. Under that interpretation, the authority to exchange would only be conditioned upon an appraisal of the exchange lands and obtaining at least the appraised value in exchange for the state lands; there would be no companion requirement of notice and public auction to the highest and best bidder. The Land Commissioner reasons that an exchange is a form of disposal, not expressly prohibited by the Enabling Act, and thus it falls within his general "disposal" authority.

**{35}**    We reject the Land Commissioner's interpretation. We cannot accept the notion that use of the word "dispose[d]" in Section 10 grants additional, residual authority to convey trust land beyond a sale or lease. Significantly, Section 10 of the Enabling Act requires that disposals occur "only in the manner provided herein," thus limiting, rather than broadly granting, the Land Commissioner's power to dispose. The word "dispose" appears three times in Section 10 of the Enabling Act:

> [A]ll lands hereby granted . . . shall be . . . held in trust, to be *disposed* of in whole or in part *only in manner as herein provided* and for the several objects specified in the respective granting and confirmatory provisions . . . .
>
> *Disposition* of any of said lands . . . for any object other than that for which such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or *in any manner contrary to the provisions of this act,* shall be deemed a breach of trust . . . .
>
> . . . .
> All lands, leaseholds, timber and other products of land before being offered shall be appraised at their true value, and no sale or *other disposal* thereof shall be made for a consideration less than the value so ascertained

11

. . . .

(Emphasis added.)  The first two uses explicitly negate an expansive interpretation.  They direct the reader to the Act's limitations (lands are "to be disposed of . . . only in manner as herein provided" and "[d]isposition . . . in any manner contrary . . . shall be deemed a breach of trust").  Any infraction of the Act's limited bounds is prohibited as a "breach of trust."

**{36}**     The third use of "disposal" specifies the "manner" in which disposals of land should occur.  It directs that land trust holdings shall be appraised and no sale or other disposal shall be made for a consideration less than appraised value.  The Land Commissioner is correct to interpret this passage as requiring an appraisal before any transaction involving state trust land, not only for sales but also for leases.  Because leaseholds are also expressly contemplated in Section 10, "sale *or other disposal*" is necessary language to include such conveyances.  The phrase "or other disposal," does not create, however, a new universe of possible disposals, such as swaps or exchanges, exempt from the conditions required for sales and leases.  We have repeatedly recognized that "[w]here authority is given to do a particular thing and a mode of doing it is prescribed, it is limited to be done in that mode; all other modes are excluded.  This is a part of the so-called doctrine of expressio unius est exclusio alterius." *Fernandez v. Espanola Pub. Sch. Dist.*, 2005-NMSC-026, ¶ 6, 138 N.M. 283, 119 P.3d 163 (internal quotation marks and citation omitted).

**{37}**     The Enabling Act's plain language is more than sufficient to establish the absence of any implicit grant of land exchange power.  Despite this, we put forth the congressional history showing the factors that formed the Act's restrictions and the election history that demonstrates voter intent to refrain from amending the Act to allow for land transfers.  These histories further illustrate the intended limitations on the Land Commissioner's disposal of land.

**B.        Enabling Act Drafters Purposely Constrained Land Commissioner Authority**

**{38}**     To infer broad authority from the word "dispos[e]" would be to construe the Enabling Act precisely in the manner that Congress and the leaders of the New Mexico Territory sought to avoid.  The Enabling Act was written to "preclude any license of construction or liberties of inference." *Ervien v. United States*, 251 U.S. 41, 47 (1919).  Contrary to the consistent "narrow interpretation" by the U.S. Supreme Court, *see, e.g.*, *United States v. N.M.*, 535 F.2d 1324, 1327 (10th Cir. 1796), the Land Commissioner would have us construe "dispos[e]" to afford additional, broad, and almost unrestrained authority to convey state trust land, subject only to the single requirement that any such disposal obtain at least true appraised value.  The Land Commissioner's view, however, would ignore the history that influenced the Enabling Act's restrictions on land disposal. *See* Robert W. Larson, *New Mexico's Quest for Statehood 1846-1912* 268 (1968) ("Lands granted [by the Enabling Act] were placed in a trust to be disposed of by a specified procedure.").

**{39}**     As the Arizona Supreme Court has noted, "the Enabling Act for New Mexico and

12

Arizona marked a complete and absolute departure from the enabling acts under which other states were admitted to the Union." *Murphy v. State*, 181 P.2d 336, 344 (Ariz. 1947). More specifically, the Enabling Act was a response to, and an attempt to preclude, the types of abuses that had occurred in other states and in territorial New Mexico. *Id.* Unfettered local control of trust lands had

> left a scandal in virtually every state, and these granted lands and the monies derived from a disposition thereof were so poorly administered, so unwisely invested and dissipated, that Congress concluded to make sure, in light of experiences of the past, that such would not occur in the new states of New Mexico and Arizona.

*Id.* New Mexico's own scandal involved land covered with valuable timber that had been granted to the Territory of New Mexico through a federal act in 1898; territorial authorities had violated the law in disposing of the timber. *Id.* at 345. The Enabling Act was drafted in the wake of twelve pending U.S. Department of Justice lawsuits in the New Mexico Territory against corporations or against the Territory in conjunction with a corporation. S. Rep. No. 61-454, at 37 (2d Sess. 1910). In addition, it has been widely represented that during the years following the Civil War and leading up to New Mexico's statehood, members of the so-called "Santa Fe Ring," a group of land speculators, including prominent politicians, lawyers, and other leading citizens of the territory, assumed huge land holdings through corrupt practices, taking advantage of legal discrepancies and ignorance of the land law on part of land grant holders. *See generally* David Correia, *Appendix: Land Grant Speculation in New Mexico During the Territorial Period*, 48 Nat. Res. J. 927 (2008).

**{40}** The history surrounding the Enabling Act demonstrates an intent to prevent future corruption by strictly limiting the ability of the Land Commissioner to dispose of trust lands. *See, e.g.*, Larson, *supra*, at 267 (explaining that the reasons for the "[h]arsh restrictions on the handling of public lands," included in the Senate version of the statehood bill and eventually adopted in the Enabling Act, "may be traced back to the land fraud scandals"). The Enabling Act's land disposal conditions were designed to protect the Land Commissioner from exposure to corrupt and coercive forces. Indeed, Senator Beveridge of Indiana, Chairman of the Committee on the Territories, considered the restrictions on disposal of the land to be "quite the most important item" in the legislation. *Lassen v. Arizona ex rel. Arizona Highway Dep't*, 385 U.S. 458, 468 (1967). The Senate Bill stipulated that any conveyance of public trust land must be at a public auction, after adequate public notice, to the highest bidder, at no less than appraised value. In addition, "transactions upon credit" were prohibited unless "accompanied by security." S. Rep. No. 61-454, at 18.

**{41}** Senator Beveridge had good reason for his opinion that the restrictions on land disposals were the most important part of the Enabling Act legislation. Concerns about disposal of New Mexico's land were held at the highest level of government, by President Roosevelt. *See* 2 Ralph Emerson Twitchell, *The Leading Facts of New Mexican History* 549

13

(Sunstone Press 2007) (1912).  In 1906, when Herbert J. Hagerman was appointed governor of the territory of New Mexico, "[i]t was generally believed that [Hagerman] had been chosen for the express purpose of assisting in uncovering frauds in the sale and disposal of lands . . . to corporations and special interests, to some of which the territorial officials and their friends were parties . . . ."  *Id.* at 549.

**{42}**  In authoring and signing the Enabling Act, members of Congress sought to limit the power of the Land Commissioner by requiring transparent and fair disposal of public land for the public's benefit.  In addition to discussing the ongoing lawsuits in the Territory, Senator Beveridge's Committee on the Territories Report, accompanying the Senate bill, highlighted testimony by two leaders representing the Territory of New Mexico.  *See id.* at 20.  At that time, L. Bradford Prince was a former New Mexico Territorial Governor, *id.*, and Charles A. Speiss was President of the New Mexico Constitutional Convention of 1910. *New Mexico Blue Book 2007-2008* 48 (Mary Herrera, Secretary of State ed. 2008).  Each New Mexican leader responded to questions from the Committee Chairman:

> The CHAIRMAN.  . . . .  I understand you to say in private conversation that you highly approved, as you said every other man did who thought of the subject, of the safeguards thrown about the disposition of public lands granted in this bill.
> Mr. PRINCE.  We approve of the strictest safeguards that can possibly be found in order to insure the perpetuity of that fund and its inviolability.

S. Rep. No. 61-454, at 20.  This Court also considers the restrictions on land disposals inviolate.  The Report's highlighted testimony continued:

> The CHAIRMAN.  At that point, let me ask you this question:  In the bill introduced in the Senate, known as the Senate bill, very careful restrictions have been thrown around the disposition of this land.  I understand you to say to me in private conversation that you were entirely satisfied that the restriction could not be made too strong.
> Mr. SPIESS.  Absolutely, Senator, and more than that.  We would have adopted those same restrictions by our constitutional convention—

*Id.*

> The CHAIRMAN (interposing): So you have no objection to these restrictions?
> Mr. SPIESS:  No sir.

*Hearing Before the Committee on Territories, United States Senate*, 61st Cong. 19 (1910) (statements by Sen. Albert Beveridge, Chairman, S. Comm. on the Territories).  Testimony from Arizona representatives expressed similar support for the restrictions, asserting "the restrictions on such public lands can not be made too broad."  S. Rep. No. 61-454, at 21.  An

14

Arizona representative even testified that he desired measures that would prevent the public trust lands from being disposed of "in large areas." *Id.* at 20.

**{43}** While this Court will usually defer to an executive official's discretion, the Enabling Act's conditions and limitations were purposefully designed to circumscribe discretion. *See United States v. New Mexico*, 536 F.2d 1324, 1327 (10th Cir. 1976) ("In construing the Enabling Act, the Supreme Court citing the restrictions placed on the use of the trust lands has consistently applied a narrow interpretation to the terms of the Enabling Act.").

> The central problem which confronted the [Enabling] Act's draftsmen was . . . to devise constraints which would assure that the trust received in full fair compensation for trust lands. The method of transfer and the transferee were material only so far as necessary to assure that the trust sought and obtained appropriate compensation. This is confirmed by the legislative history of the Enabling Act. All the restrictions on the use and disposition of the trust lands, including those on the powers of sale and lease, were first inserted by the Senate Committee on the Territories. Senator Beveridge, the committee's chairman, made clear on the floor of the Senate that the committee's determination to require the restrictions sprang from its fear that the trust would be exploited for private advantage. He emphasized that the committee was influenced chiefly by the repeated violations of a similar grant made to New Mexico in 1898. The violations had there allegedly consisted of private sales at unreasonably low prices, and *the committee evidently hoped to prevent such depredations here by requiring public notice and sale.* The restrictions were thus intended to guarantee, by preventing particular abuses through the prohibition of specific practices, that the trust received appropriate compensation for trust lands.

*Lassen*, 385 U.S. at 463-64 (1967) (emphasis added) (footnotes omitted); *see also State ex rel. State Eng'r v. Comm'n of Pub. Lands*, 2009-NMCA-004, ¶ 30, 145 N.M. 433, 200 P.3d 86 (declining to interpret the terms of the Enabling Act expansively when the congressional intent behind the terms was clear).

**{44}** The implications of the Land Commissioner's interpretation of the Enabling Act cannot be overstated. The inescapable result of validating these exchanges under his reasoning would be to authorize future public-private exchanges of *any* scale, subjecting millions of acres of trust land to "disposition" at the discretion of the Land Commissioner. We fail to understand why Congress would have taken such pains to safeguard sales and leases for the benefit of the trust, and then leave open all other kinds of "dispositions" from the trust to the vagaries of influence and manipulation. The Land Commissioner's interpretation would open the door to collusive deals and favoritism, a door the framers of the Enabling Act explicitly stated intentions to shut. It would allow private deals favoring select private parties.

15

## C.      The Failed 1990 Constitutional Amendment

**{45}**      In addition to the Enabling Act's plain language and its historical context, the recent 1990 election further confirms that the Enabling Act does not implicitly  authorize exchanges.  The proposed 1990 constitutional amendment would have added the following new language to Section 10 of the Enabling Act:

> The State commissioner of public lands may exchange any land granted or confirmed by this Act for any land of the United States or an agency thereof, a State agency or political subdivision, a beneficiary of lands granted or confirmed by this Act, an Indian tribe or pueblo*, or a private entity* when the commissioner finds, after consultation with the chief administrative officer of the affected beneficiary of lands granted or confirmed by this Act, that—
> > (1) based upon appraisals of the true value thereof, the value of the land to be received by the State is equal to or greater than the land to be conveyed by the State; and
> > (2) the proposed exchange is beneficial to the interests of the affected beneficiary.

Act of June 20, 1910, Pub. L. No. 101-386, § 1, 104 Stat. 739 (1990) (amending the Act of June 20, 1910) (emphasis added) (quotation marks omitted).  The amendment required first a vote of Congress, Enabling Act, § 2(I), then a vote of the New Mexico Legislature, and finally the approving vote of the people, N.M. Const. art. 19, § 4.  It failed the popular vote by a substantial margin.   The amendment essentially would have given the Land Commissioner the authority to enter into exchanges with private land owners, subject only to appraised value and without a public auction, authority that a 1988 New Mexico Attorney General Opinion had concluded did not exist.

**{46}**      The 1988 Opinion had concluded that "the Commissioner of Public Lands may not exchange state trust lands for lands of equal value held by private persons, local governing bodies, trust land beneficiary institutions, state agencies or federal agencies other than the Interior Department."  N.M. Att'y Gen. Op. 88-35 (1988).  The Attorney General Opinion had also concluded that, since the Enabling Act requires that lands be assigned a monetary value, then "any disposition of trust lands will be for an agreed upon value and will result in a 'sale' rather than an 'exchange.'"  *Id.*  Continuing on, the 1988 Opinion had also concluded that, "[b]ecause of the mandatory appraisal, it is not possible for the Commissioner to engage in 'exchanges' of trust land for other land.  The conveyances by the Commissioner will be 'sales,' and moreover must comply with the Enabling Act's requirements, including appraisal, advertisement and public auction with sale to the highest bidder."  *Id.*

**{47}**      Following the defeat of the proposed 1990 amendment, a subsequent attorney general overruled the 1988 Opinion.  *See* N.M. Att'y Gen. Op. 91-15 (1991).  The 1991 Opinion concluded that the Enabling Act's use of the word "dispose" gives the Land Commissioner

broad authority to convey land beyond just a sale or a lease, including a private exchange. *Id.* ("The authority of the Commissioner to 'dispose' of public lands granted by the New Mexico Constitution and, with restrictions, by the Enabling Act includes the power to exchange public lands."). The 1991 Opinion also concluded that some of the sale and lease restrictions in Section 10 of the Enabling Act applied to exchanges (such as the requirement for sale at no less than appraised value), but that other restrictions (notice and public auction) did not apply.[3] *Id.* Thus, the 1991 Opinion advised that the Land Commissioner had the very exchange authority the people had rejected in the 1990 popular vote.

**{48}** The proposal and failure of the 1990 constitutional amendment attests to the lack of legal authority to conduct unrestricted land exchanges with private entities under the Enabling Act. The Land Commissioner disagrees. He argues that the authority to exchange land with private parties existed even before 1990, and that the 1988 Opinion was simply misguided when it asserted the contrary. Accordingly, the proposed (and defeated) amendment was meant merely to "clarify" the preexisting authority. According to the Land Commissioner, the voters' rejection in 1990 meant only that, in their judgment, the Enabling Act did not need clarification because the Land Commissioner had exchange authority all along. We are not persuaded.

**{49}** Following the Land Commissioner's logic, the legislative machineries of both the U.S. Congress and the State of New Mexico were put into motion simply to clarify an exchange authority that the Land Commissioner already had. And from there, the Land Commissioner's logic would lead us to conclude that the voters' decisive rejection of the proposed amendment was actually an endorsement of his exchange authority.

**{50}** We operate from a working assumption that the Legislature (and for that matter the U.S. Congress) is well informed about the law and that its legislation is usually "intended to change the law as it previously existed." *Bird*, 91 N.M. at 284, 573 P.2d at 218; *see also Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."). We conclude that this intention is especially true for amendments to the State Constitution and the Enabling Act—our most fundamental law.

**{51}** When New Mexico Senator Domenici addressed the U.S. Senate in support of the proposed amendment, he explained that it would "*permit* the State of New Mexico to exchange . . . lands granted . . . by the United States," and that without the proposed amendment "[u]nder the Enabling Act, the Public Lands Commissioner can only dispose of trust lands by sale or lease to the highest bidder at a public auction." 136 Cong. Rec. 21,234, 1990 WL 110523 (emphasis added). Senator Domenici went on to explain that "New Mexico

---

[3]We note that this Court is not bound by opinions issued by the Attorney General and will give them only such weight as deemed appropriate. *See First Thrift & Loan Ass'n v. State ex rel. Robinson*, 62 N.M. 61, 70, 304 P.2d 582, 588 (1956).

has not amended its Enabling Act to permit such exchanges, except for the limited purposes of exchanging trust lands for National Forest Lands." *Id.*

**{52}** Congressman Vento of Minnesota, Chairman of the Subcommittee on National Parks and Public Lands, described the proposed amendment as a "noncontroversial measure" dealing with a "technical . . . problem." 136 Cong. Record 23,619 (1990), 1990 WL 129809. He admitted that the amendment was necessary because of doubt as to "the legal ability of the State, under the enabling act, to carry out . . . exchanges." *Id.*

**{53}** New Mexico Congressman Skeen urged passage of the "essential" amendment because "current authority is too restrictive to allow the land commissioner to properly carry out his responsibilities." *Id.* at 23,620. In fact, Congressman Skeen advised that "[t]o remedy this void, Congress must pass this legislation allowing a change in the State's Enabling Act. The voters of New Mexico must then approve a constitutional amendment." *Id.* These excerpts suggest that New Mexico's members of Congress knew, and that Congress was surely advised, that without a change in the Enabling Act, the Land Commissioner could not legally engage in private land exchanges no matter how advisable or beneficial they might be.

**{54}** The voters likely understood the proposed amendment in similar terms. Despite its title, "To clarify the authority of the Commissioner of Public Lands to exchange lands under his control," the thrust of the proposed amendment was a grant of new authority to the Land Commissioner. The 1990 proposed amendment was not the first time the Land Commissioner had attempted to expand his authority, and it was not the first time such an expansion was rejected by the people. Former Land Commissioner Humphries was well aware of this trend when he addressed the Subcommittee on Public Lands, National Parks and Forests in support of the amendment: "[H]istory clearly reveals that the people of New Mexico have acted upon several exchange amendments and have clearly limited the commissioner's authority to exchange." 136 Cong. Rec. 21,235, 1990 WL 110523 (adopting Humphries' earlier subcommittee statement into the record on the Senate floor).

**{55}** In 1990, the people of New Mexico once again "acted upon" an "exchange amendment[]," and once again they "clearly limited the commissioner's authority to exchange." *Id.* We have no basis to conclude that the way people voted on the issue of the Land Commissioner's exchange authority in 1990 was any different than the way they have always voted. If the Land Commissioner wants exchange authority, then he must ask the people, and if the people turn his proposal down, then he does not have the desired authority. The Land Commissioner would have us engage in logical and semantical gymnastics. Instead, we subscribe to the reasoning that, if the Enabling Act had always granted the Land Commissioner authority to conduct exchanges, there would have been no need for the

amendment.[4] *Fain Land & Cattle Co. v. Hassell*, 790 P.2d 242, 248 (Ariz. 1990) (in banc); *see also Thompson v. Legislative Audit Comm'n*, 79 N.M. 693, 696, 448 P.2d 799, 802 (1968) ("[T]he [constitutional amendment] was defeated, thus showing that the people were not willing to allow [an amendment] to sanction the legislative [action providing the same as the amendment that] would not only thwart the constitutional provision but would circumvent the will of the people as expressed at the ballot box.").

**D.      Exchanges for a Minimum Monetary Value May Be Considered In-Kind Sales**

**{56}**    Because disposals are limited to the manner provided within the Enabling Act and exchanges are not provided for, if any exchanges are permitted, such exchanges must be *in-kind sales*.  Exchanges of land based on the monetary value of each parcel may be considered equivalent to a sale where the appraised consideration is not cash, but land.  Thus, any exchange authority is subject to the same restrictions that apply to all sales governed by Section 10:  public notice, a public auction with sale to the highest and best bidder, and sale at a price no less than appraised value.

**{57}**    This understanding of the Enabling Act recognizes the Act's common ground with Arizona's Enabling Act.  Arizona is our sister state—the same federal legislation enacted the New Mexico and the Arizona enabling acts, and the Arizona Enabling Act was nearly identical to the New Mexico Enabling Act when Arizona entered the Union.  *Compare* Enabling Act, ch. 310, §§ 1-18, 36 Stat. 557, 557-68 *with* §§ 19-35, 36 Stat. 557, 568-79.  In *Fain*, the Arizona Supreme Court considered the Arizona Enabling Act.  Despite an amendment to the Arizona Enabling Act that "clearly permit[ted] Arizona to authorize exchanges of public trust lands," the court concluded that such exchanges, still subject to the requirement for a minimum monetary value in return, amounted to in-kind sales that were subject to the Enabling Act's sales requirements.  *Fain*, 790 P.2d at 246-47; *but see id.* at 253 (Corcoran, J., concurring in result) ("The best indication that an exchange is not a 'sale' . . . is that exchanges were not allowed as 'sales' under the 1910 Enabling Act until it was amended in 1936 to include them.  Implicit in that amendment is a recognition by Congress that the Enabling Act of 1910 did not allow exchanges.").  *Fain* explained that when "there is a fixed value at which the exchange is to be made," 790 P.2d at 247, the transaction is

---

[4]Unlike the New Mexico Enabling Act, the Arizona Enabling Act was amended authorizing Arizona "to exchange any lands owned by it for other lands, public or private, under such regulations as the legislature thereof may prescribe: *Provided*, That such exchanges involving public lands may be made only as authorized by Acts of Congress and regulations thereunder."  Act of June 5, 1936, ch. 517, § 28, 49 Stat. 1477, 1478 (amending the Enabling Act for the State of Arizona, approved June 20, 1910).  The Arizona Supreme Court interpreted the amendment as "Congress merely consent[ing] to removal of the restrictions against exchange of trust land, but . . . not requir[ing] Arizona . . . to amend its constitution or to pass legislation to allow exchanges." *Fain Land & Cattle Co. v. Hassell*, 790 P.2d 242, 249-50 (Ariz. 1990) (in banc) (footnote omitted).

really a sale with consideration received in-kind rather than as cash, *see id.* at 246-48 (distinguishing its conclusion from jurisdictions that have differentiated between land exchanges and sales by quoting 30 Am. Jur. 2d *Exchange of Property* § 3, 365-66 (1967), which explained that the exchange of properties without measuring the value in terms of money is an exchange, but that the disposal of property for valuable consideration measured in terms of money is a sale).

**{58}** Although the New Mexico Enabling Act has not been amended to "clearly permit . . . exchanges" like the Arizona Enabling Act, except in terms of exchanges with the U.S. Department of the Interior, we find *Fain* persuasive. A conveyance of land in exchange for other land, when the value is measured in monetary terms, may be considered an in-kind sale. This conclusion is also consistent with the 1988 Opinion by the New Mexico Attorney General, characterizing exchanges for a minimum monetary value as in-kind sales. N.M. Att'y Gen. Op. 88-35. Indeed, given the Enabling Act's restrictions, the Land Commissioner can exchange only if the transaction passes scrutiny as a sale. As noted in *Fain*, Section 10 of the Enabling Act states in the most explicit terms that all state trust lands, leaseholds, timber, and so forth, "shall be appraised at their true value" and cannot be sold or otherwise disposed of "for a consideration less than the value so ascertained." Thus, the Land Commissioner may not dispose of *any* trust land without first establishing its value in monetary terms and obtaining at least that monetary value as consideration.

**{59}** For all the reasons discussed in this Section, we hold that, as an in-kind sale, any exchange of land must comply with the Enabling Act's sales provisions. We stress that a constitutional amendment remains an option to obtain authority to conduct land exchanges without these restrictions. The Land Commissioner's argument, that the 1988 Attorney General Opinion created so much confusion that congressional action and a constitutional amendment were required, concedes that the same need for such a constitutional amendment exists today. In the meantime, any ambiguity should be construed consistently with congressional intent and electoral will, and both counsel against the Land Commissioner's expansive interpretation.

### III.    Public Auction to the Highest and Best Bidder

**{60}** The State Land Office has promulgated regulations that, the Land Commissioner argues, adequately provide for a public auction. We do not dispute whether the four challenged exchanges were conducted under these regulations. Rather, in this Section, we examine the second purely legal question regarding the Enabling Act's limitations on the Land Commissioner's discretion that we put forth above in our mandamus discussion: "As a matter of law, do the challenged exchanges comply with the required elements for a valid sale of land, including the requirement of a public auction to the highest and best bidder?"

### A.    A Public Auction Defined

**{61}** An auction is "[a] public sale of property to the highest bidder." *Black's Law*

*Dictionary* 149 (9th ed. 2009). In 1876, the Ohio Supreme Court described the history of the auction:

> This practice is said to have originated with the Romans, who gave it the descriptive name of *auction*, an increase, because the offered property was sold to him who would offer the most for it. This method of sale was established by the Romans for the disposal of military spoils, and was conducted *sub hasta*—-that is, under the spear; on such occasions the spear was stuck in the ground. This practice has passed away as to the spear, but the method still continues.

*Crandall v. State*, 28 Ohio St. 479, 481 (1876). The court described some "modern" variations, including the "Dutch method" and "sale by candle," but concluded that all variations have common elements:

> At auctions the bidders fix by competition the price at which the offered property is sold. This competition is an element of each offer and each bid. Into each of the methods named, competition is a necessary element in the offer, the bid and the act of selling the offered property.

*Id.* Thus, competition is the means by which an auction achieves the primary goal, obtaining the best return for the seller. Around the same time, the U.S. Supreme Court described its understanding of a public auction: "When the law requires a sale of property, real or personal, to be made at public auction, after due notice, it is for the purpose of inviting competition among bidders that the highest price may be obtained for what is sold." *Porter v. Graves*, 104 U.S. 171, 174 (1881).

**{62}** Contemporaneously with the passage of New Mexico's Enabling Act, several state courts discussed the required elements for an auction. The Montana Supreme Court interpreted the requirement that "sales of state lands shall be at public auction," to mean "a sale to the highest and best bidder with absolute freedom for competitive bidding." *State ex rel. Danaher v. Miller*, 160 P. 513, 515 (Mont. 1916) (internal quotation marks and citation omitted). The court further warned that "[a]ny agreement . . . to stifle competition or chill the bidding is a fraud upon the principle upon which the sale is founded." *Id.* The Supreme Court of the Territory of Hawaii explained that "competition . . . is that which distinguishes a sale at auction from other sales where the attempt to sell and to agree on a price is made with but one prospective purchaser at a time." *Territory v. Toyota*, 19 Haw. 651, 653 (1909). The Idaho Supreme Court adopted Hawaii's perspective: "In an auction, competition is a necessary element . . . ." *Hammond v. Alexander*, 177 P. 400, 401 (Idaho 1918) (citing *Toyota*, 19 Haw. at 653).

**{63}** The foregoing opinions, issued around the same time that New Mexico became a state, are some indication of what the framers of the Enabling Act likely meant when they said: "Said lands shall not be sold or leased, in whole or in part, except to the highest and

best bidder at a public auction." Over time, courts have continued to focus on the element of competition as essential to a public auction. *See In re Peoples Cab Co.*, 89 F. Supp. 577, 580 (W.D. Pa. 1950) ("[T]he very purpose of an auction . . . is to fetch together all those who may be interested to buy and set them against each other with whatever stimulus that may provide, as opposed to other kinds of sale."); *B.H. Stief Jewelry Co. v. Walker*, 256 S.W.2d 392, 397 (Tenn. Ct. App. 1952) ("Competitive bidding, up or down, is an essential element of an auction sale. A sale at fixed or flat prices, no higher nor lower, is not an auction sale regardless of the manner in which the merchandise is offered for sale at the fixed price."); *State v. Pub. Util. Comm'n of Tex.*, 246 S.W.3d 324, 343-44 (Tex. App. 2008) (explaining the legislature's intent in requiring an auction was to encourage competition); *Kolbo v. Blair*, 379 S.W.2d 125, 129 (Tex. App. 1964) ("[A] sale at public auction is a sale to the highest bidder—its object, a fair price—its means, competition—its results, a sale, presumed as a matter of law to be fairly conducted."); *Mfrs. Hanover Trust Co. v. Koubek*, 396 S.E.2d 669, 671-72 (Va. 1990) (explaining that a public sale and auction require a competitive environment and that the early policies behind the requirement, protecting financial return, still apply today). We recognize that competition has been an essential element of a public auction since before the time New Mexico adopted the Enabling Act, that it was essential when New Mexico adopted the Enabling Act, and that it is still essential today.

**{64}**     Courts have also emphasized that an auction's purpose is distinct from other types of sales. The Hawaii Territorial Court, for example, instructed that "[t]he main purpose of auction sales is to obtain the best financial returns for the owners of the property sold." *Toyota*, 19 Haw. at 652. The public auction, thus, is a mechanism to make sales using an objective basis, the highest financial gain, to discern between offers. This characteristic of an auction made it an attractive tool when states sought to safeguard public land sales against favoritism. The Minnesota Supreme Court explained that the public auction requirement for sales of its state school lands was "to foster and conserve the school fund, to prevent school lands from being sold at an inadequate price, and to secure competition therefor, and to guard against favoritism in the disposition thereof." *State v. Evans*, 108 N.W. 958, 959 (Minn. 1906)

**{65}**     The U.S. Supreme Court stated that the public auction and notice requirements in the Arizona and New Mexico Enabling Act "were . . . intended to guarantee, by preventing particular abuses through the prohibition of specific practices, that the trust received appropriate compensation for trust lands." *Lassen*, 385 U.S. at 464 (considering Arizona's identical Enabling Act); *see also Fain*, 790 P.2d at 248 ("The purpose of [the auction] provision is to ensure that the trust receives the most benefit possible from sale or other use of the trust lands. Without sale at public auction, the trust is not guaranteed the additional profit that might result from competitive bidding." (internal citation omitted)). As previously explained, the "particular abuses" that Congress sought to prevent were "the repeated violations of a similar grant made to New Mexico in 1898 . . . [that] allegedly consisted of private sales at unreasonably low prices, and the [Senate Committee on the Territories] evidently hoped to prevent such depredations here by requiring public notice and sale." *Lassen*, 385 U.S. at 464 (footnote omitted).

22

**{66}** Finally, courts recognize that for a valid auction to occur it must be "fair and open." *See, e.g.*, *Springer v. Kleinsorge*, 18 Mo. 152, 163 (1884) ("The offer of property at public auction is itself a proclamation by the seller that the highest bidder, in a fair and open competition, is to obtain the property."). Open competition furthers the purpose of using an auction as a sale mechanism because it dissuades favoritism and encourages objectivity. This raises the question as to what "open" means. Case law and our own Enabling Act's history demonstrate that an auction remains "open" even if general parameters are established for the purpose of ensuring that the highest *bid* also results in the highest financial delivery. In other words, limiting bids to those parties whose credit is secured or parties who have other indicia of reliability in order to guarantee the "best financial returns," is acceptable.

> Some measure of discretion is vested in auctioneers as to the precise methods to be pursued in attaining [the best financial returns], for example, bids need not be accepted from minors or from persons irresponsible either financially or mentally or from drunken persons or from one offering in bad faith or even from one making but a slight raise in his bid over the bid last announced.

*Toyota*, 19 Haw. at 653.

**{67}** Section 10 of the Enabling Act incorporates the idea that an "open" auction can be limited to pursue the best financial return as well. S. Rep. No. 61-454, at 18. Significantly, a prior version Section 10 of the New Mexico Enabling Act did not provide for an auction to the "highest *and best* bidder," but rather only the "highest bidder," S. Rep. No. 61-454, at 18. That earlier version also prohibited land sales on credit, "unless accompanied by security," *id.*, the credit sales provision was later removed, and the term "and best" was added, requiring that the winning bidder be the "highest and best," Enabling Act § 10. The initially proposed limitation on credit sales is precisely the type of limitation contemplated by the requirement that the highest bid also be the "best bid." Requiring sale to the "highest and best" bidder therefore provides for objective selection of the winning bid at a public auction, while ensuring that the sale remain open to competitive bidding.

**{68}** Thus, the Enabling Act's mandate that sales be only to "the highest and best bidder at a public auction" requires more than just a minimum floor price. It means that the trust beneficiaries have, at least, an opportunity by way of a sale driven by open competition among bidders for the *best* price. The inclusion of the term "best" does not, however, provide discretion in selecting the winning bidder. Just as other courts have done before us, we recognize that the purpose of an auction is to obtain the highest financial return. Further, we recognize that Congress selected a public auction as the mechanism for selling public lands in New Mexico to allow an objective means for buyer selection, thus eliminating the risk of favoritism that was pervasive in public land sales, particularly in the New Mexico Territory before the Enabling Act.

## B. Private Negotiations and Bargaining

**{69}** Before today our Court had not discussed the elements required for a valid public auction. In *State ex rel. Otto v. Field*, however, we wrote that the Enabling Act requires the same basis for all bids and bidders and that a *negotiated* contract, established after an auction, would be objectionable because it would defeat that requirement. 31 N.M. 120, 179, 241 P. 1027, 1050 (1925). Other jurisdictions have found that negotiations and bargaining prior to an auction impede competition and are inconsistent with the meaning of a true auction. As we shall see, the presence of extended negotiations with one bidder long before notice to the public of an auction presents a particular problem for the Land Commissioner in this case.

**{70}** The U.S. Supreme Court long ago recognized the contradiction between private negotiation and public auction. *See Porter v. Graves*. 104 U.S. 171 (1881). In *Porter*, a seller negotiated for the sale of property left intestate, for which state law required sale of the intestate property at a public auction. *Id.* at 172-73. In order to "comply" with that law, the property was advertised and then announced at the sale by the auctioneer as "sold to perfect a contract for sale" to the buyer's company. *Id.* at 173. The Court found that, if the sale were challenged by parties "interested in having the property bring its full value," the sale would surely have been set aside because it was not a valid auction. *Id.* at 174. Continuing on, in language particularly appropriate to the four challenged exchanges in this case, the Court stated:

> To make a private bargain beforehand between the party who wishes to buy and the person authorized to sell, as to the price and other incidents of the contract, and then invoke the forms of a public sale with competition to give effect to the private bargain is a course of procedure well calculated to defeat the purpose for which the public sale is required.

*Id.* at 174.

**{71}** Similarly, state courts have found negotiations and bargaining between bidders prior to an auction to be antithetical to a valid auction. In *Hammond*, the Idaho Supreme Court found that a conveyance of state trust land was not sold by auction as required by the state's constitution, when negotiations occurred between the bidding parties. 177 P. at 400-01. Before bidding started, auction participants drew lots among themselves for the parcels of land available and then took turns "bidding," one party per parcel, as determined by the lots drawn. *Id.* Although the court found that not all agreements among prospective bidders would defeat an auction, "if the purpose in so agreeing is to stifle competition, and if it causes the property to be awarded to a bidder, or bidders, for less than would have otherwise been offered, the vendor may avoid the sale." *Id.* at 401. Because the court found the sale was void, it rejected the writ of mandamus requesting enforcement of the sale. *Id*.

**{72}** We recognize that bargaining and negotiation between buyers and sellers or between buyers prior to a sale negates the essence of what it means to have a public auction free and open to competition. Rather than seeking the highest financial gain through objective means,

24

negotiation and bargaining design a satisfactory exchange for two parties to the exclusion of the public. *See Black's Law Dictionary*, *supra*, at 169 (defining a bargain as "[a]n agreement between parties for the exchange of promises or performances), 1136 (defining a negotiation as "[a] consensual bargaining process in which the parties attempt to reach agreement on a disputed or potentially disputed matter"). "Negotiation usu[ally] involves complete autonomy for the parties involved, without the intervention of third parties." *Black's Law Dictionary*, *supra*, at 1136.

## C.      The Challenged Exchanges

**{73}**      For the following reasons, the four challenged land exchanges do not comply with the Enabling Act's requirement for a public auction. The undisputed facts on record show that each land exchange process involved extensive private negotiations with specific parties. Those private parties had significant advantages over any possible "competitors." The Land Commissioner "target[ed]" the exchange lands as part of an overall plan, whereby the purpose of the exchanges was not to secure the highest financial gain to the trust through selection of the "highest and best" bid, but rather to accomplish other land management goals. Finally, the means for selecting the winning bid were not objective. Thus, the exchanges embody the elements indicative of favoritism that the drafters of the Enabling Act sought to avoid by requiring public notice and public auction.

**{74}**      In describing the Stanley Ranch exchange, the Land Commissioner concedes that the exchange would not have been possible or desirable to the state:

> In the absence of this kind of discussion and a bidding process that allowed for a single transaction in which certain trust lands would be conveyed for other lands which would justify the disposition, it is unlikely that any kind of transaction could be completed that would provide sufficient benefit to the trust.

In other words, the negotiations that took place for the Stanley Exchange were the only way to accomplish the goals the State Land Office had set for that land exchange. Because no other parties had the opportunity to participate in such discussions that made "any kind of transaction . . . sufficient[ly] benefi[cial] to the trust," there was no competition, no safeguards of objectivity, no openness, and thus no "public auction."

**{75}**      The Land Commissioner insists there was no taint of favoritism. But the requirement of a public auction means that the people should not have to take anyone's word attesting to his or her objectivity. To the contrary, the Enabling Act chose a mechanism to protect against favoritism and stipulated a public auction "to the highest and best bidder" through open competition. The people did not select, and in fact rejected, "private negotiation" as an approved mechanism for the sale of public land.

## D.      Lack of Competition

**{76}** During oral argument the Attorney General compared the challenged land exchanges to the sale of a tailor-made suit; he questioned whether any true competition could take place when an auctioned product was custom-made for only one particular customer. The metaphor is a good one, if incomplete. More precisely, each transaction is better thought of as an exchange of tailor-made suits, in which the "auctioned" suit is custom-made for the buyer, suits are the preferred currency, and the "winning" suit is custom-made for the seller. No one else has such a suit, or as a practical matter, can find one. Competition is surely in jeopardy when the bidding party also holds the one and only suit custom-made for the seller.

**{77}** The uncontested facts demonstrate, more clearly than an exchange of custom-made suits, that the land exchange procedure applied in each of the four challenged exchanges lacked competition. First, each applicant (a neighboring landowner) contacted the State Land Office to specify land desired in exchange for specific land held by the State Land Office. This first step in the exchange procedure allowed the applicant the opportunity to craft the land available for sale to his own interests. While this step of the process, alone, may not have precluded competition entirely, it contributed to the lack of competition when combined with the next steps.

**{78}** The State Land Office then appraised the exchange proposal for the land's value and its ability to ameliorate management and access issues. If interested in the applicant's proposal, the State Land Office then began working with the applicants to plan a sale that satisfactorily met the interests of both parties—the applicant and the State Land Office. This second step of the exchange process allowed the applicants an extended time period, compared to the notice for any other parties, to design their bids through back and forth communication over a substantial period of time. These communications and adjustments occurred long before other potential bidders were notified that the Land Commissioner would be exchanging land.

**{79}** Even the Land Commissioner describes this process as a "negotiation" with each private land owner. In the case of the Stanley Ranch exchange, the initial evaluation by the Land Commissioner found "substantial changes would need to be made in order to proceed with the consideration of any exchange." State Land Office staff then spent many months discussing "an exchange that would meet legal requirements and be beneficial to the trust." The Stanley Ranch negotiations took two years before the Land Office announced an "auction." The UU Bar Ranch negotiation took over a year and a half, and the CS Ranch and Galloway exchange negotiations had been going on for over a year and a half before the Attorney General filed its Writ of Mandamus early in 2010.

**{80}** Based on the foregoing process, by the time an auction was announced by the Land Commissioner at the tail end of the process, one applicant already knew that its previously proposed and negotiated exchange was mutually agreeable. In contrast, all other potential bidders were permitted only ten weeks between announcement of the sale and an opportunity to participate in the sale. During those ten weeks other potential bidders had to (1) ascertain the desirability of the lands offered by the State Land Office, (2) determine the risk/reward

26

of spending the time and money to appraise their lands when another bid already existed that was acceptable to the State, (3) appraise their exchange land, and (4) construct a competitive bid of greater value than the lands offered, either independently or in cooperation with others.

**{81}** All the while, other potential bidders would know that the Land Commissioner did not have to accept their bids, even if superior in price and ability to perform—because, as we shall see in the discussion below, the Land Commissioner's criteria for selecting the winning bids were not objective, nor were they focused on the "highest and best" bid. Even if competing bids were theoretically possible in the face of the advantages to the bidding landowner and disadvantages to other bidders, the process was designed such that other bidders would not likely succeed. The foregoing procedure made competition—the essential element of an auction—improbable rather than fundamental.

### E.    Public Auction Purpose Frustrated

**{82}** In addition to the lack of competition, the challenged exchanges and the State Land Office's exchange process frustrate the intended purpose of a public auction as well as the purpose of the Enabling Act's inclusion of the public auction sales requirement. As we discussed, *supra*, the purpose of an auction is to obtain the highest financial gain, and the purpose of Congress's requirement that an auction be the mechanism used for public land sales was to require an objective means of sale, eliminating the possibility of private favoritism.

**{83}** We should be candid about the objectives of these particular exchanges. They were designed to achieve a predetermined result. The exchanges were for the purpose of addressing specific land management problems in specific geographical regions—checkerboard areas—that could only be resolved by privately negotiated exchanges with neighboring landowners. Only certain land, however, along the checkerboard border could be exchanged in a manner that would ameliorate land management problems of both the State Land Office and its neighbors. Outside land (land from somewhere else) might be worth more, even a lot more, but it could not address the checkerboarding issue; it would only replace one owner for another into the same checkerboarding problem. It is no stretch for us to recognize that these problems could only be resolved through a privately negotiated exchange, which is exactly what the parties attempted to accomplish.

**{84}** For example, the Stanley Ranch exchange would provide the ability to fulfill the State Land Office's "plan" for an access road and campsites, all part of creating "a prime recreational and quality hunting area." The UU Bar Ranch proposal was of interest because it offered in-fill parcels. The CS Ranch exchange would allow construction of a loop road and would fill in land holdings. The Galloway proposal would provide in-fill parcels and an access road.

27

**{85}** The State Land Office frankly states in its Brief in Opposition, at page 40, that

> [t]he checkerboarding problems in the White Peak area created a "compelling reason" for the Commissioner to *target specific lands for exchange* in order to consolidate, or "unitize," the existing state trust lands in the area, thereby increasing the value of those lands by more than $13 million, enhancing the Commissioner's ability to protect that land, increasing the recreational opportunities available within the area, increasing access to the trust lands, and augmenting grazing revenues.

(Emphasis added.) Not only were the lands *targeted* for exchange, but the State Land Office describes the exchanges as the Land Commissioner exercising his "power to manage lands through exchanges *designed* to address the checkerboarding problems in various parts of the state." (Emphasis added.) The State Land Office's exchange rules, in fact, state that "the commissioner . . . may select the proposal or proposals he determines are the highest and best, that is, the proposal or proposals that he believes will be most beneficial to the trust in accordance with the standards set forth in Subsection A and C of 19.2.21.8 NMAC." 19.2.21.10 NMAC (6/15/2004). Subsection A provides that "[t]he commissioner may enter into an exchange when the commissioner determines that the exchange will result in a material benefit to the trust and the purpose of the exchange would serve the best interests of the trust." 19.2.21.8(A) NMAC (6/15/2004). Subsection C, similarly, allows "the commissioner [to] select another method of determining true value [one that does not involve a qualified appraiser] if he determines that such method is in the best interests of the trust and conform to law." 19.2.21.8(C) NMAC. According to the State Land Office Rules, the purposes of land exchanges are subjectively defined by the Land Commissioner, and financial advantage to the trust is not emphasized as the priority. In line with these rules, both the Stanley Ranch and the UU Bar Ranch bid specifications vested the Land Commissioner with discretion to select the winning bid, based on subjective factors rather than absolute financial benefit to the trust fund. The "Selection of the Winning Bid" provision of the Bid Information Packets for both exchanges provided, in full:

> The Commissioner will exercise his discretion in selecting the exchange proposal which is in the best interest of the State trust, considering the following factors:
>
> (1) the extent to which the appraised value of the Offered Lands, as determined by the Commissioner, exceeds the appraised value of the Exchange Lands;
>
> (2) the effect, if any, that the bidder's proposed use of the Exchange Lands would have on the utility and value of any adjacent state trust lands;
>
> (3) the proximity of the Offered Lands to other state trust lands, and any land management

28

issues;

    (4)     the difference in acreage between the Offered Lands and the Exchange lands;

    (5)     any other benefits accruing to, or detriments to, the state trust from the proposed acquisition.

None of the five factors provides an objective, measurable means of distinguishing between bids. Even if a bid were highest in monetary value and demonstrably superior in all respects under factors (1)-(4), factor (5) would give the Land Commissioner discretion to reject that bid based essentially on anything he determined to be in the "best interest" of the trust. Such opportunity for discretion is a direct affront to the purposes of the public auction requirement.

**{86}**    In sum, the four challenged exchanges and the State Land Office exchange procedures, in general, preclude the existence of a public auction. As a matter of law, private negotiation negates the required competition. Further, the Land Commissioner's discretion to select a buyer negates the safeguards intended by the Enabling Act's auction requirement. Without the benefit of an auction's objective means of sale, awards of land only for the highest financial return to the state trust, there is no protection against favoritism. Therefore, such private land exchanges represent a departure from the Land Commissioner's ministerial duties under the Enabling Act. When the Land Commissioner chooses to dispose of land, he must do so by a true public auction.

## IV.    Scope of the Writ

### A.    Completed Exchanges.

**{87}**    The Land Commissioner exceeded the bounds of permitted authority under the Enabling Act by conducting the Stanley Ranch and the UU Bar Ranch exchanges. Section 10 of the Enabling Act provides that "[e]very sale, lease, conveyance or contract of or concerning any of the lands hereby granted or confirmed, or the use thereof or the natural products thereof, not made in substantial conformity with the provisions of this Act shall be null and void . . . ." Under NMSA 1978, Section 19-7-8 (1912), the Land Commissioner has the "power to cancel any lease, contract or other instrument executed by him which shall have been obtained by fraud or executed through mistake or without authority of law." As such, the Stanley Ranch and the UU Bar Ranch exchanges are null and void and must be cancelled. A Writ of Mandamus will issue ordering the Land Commissioner to cancel all documents or other legal instruments purporting to implement these two exchanges including any transfers of title.

### B.    The Planned CS Ranch and Galloway Exchanges

**{88}**    While the CS Ranch and Galloway exchanges have not been consummated with an

auction or a transfer of title, they have proceeded thus far in the same manner as the unlawful Stanley Ranch and UU Bar Ranch exchanges. We have held that "Public functionaries may be restrained by mandamus from doing what they know is an illegal act." *Kiddy v. Bd. of Cnty. Comm'rs of Eddy Cnty.*, 57 N.M. 145, 152, 255 P.2d 678, 683 (1953). If these exchanges were to continue as planned, the Land Commissioner would once again be in violation of the Enabling Act. Therefore, a Writ of Mandamus will issue compelling the Land Commissioner to comply with the sales requirements of the Enabling Act and ordering the Land Commissioner not to consummate or proceed any further with the CS Ranch and Galloway exchanges. *See State ex rel. Clark v. Johnson*, 120 N.M. 562, 570, 904 P.2d 11, 19 (1995) ("It is well settled that the two processes, mandamus and injunction, are correlative in their character and operation. As a rule, whenever a court will interpose by mandamus to compel the performance of a duty, it will exercise its restraining power to prevent a corresponding violation of duty." (quoting *In re Sloan*, 5 N.M. 590, 628, 25 P. 930, 942 (1891))).

## C.    Prospective Application

{89}    In light of the previously debated state of the law regarding the question of exchanges, we apply our writ and the reasoning behind it only to the exchanges challenged by the Attorney General in this case and not to any exchanges that may have taken place in the past. *See Beavers v. Johnson Controls World Servs., Inc.*, 118 N.M. 391, 397 n.7, 881 P.2d 1376, 1382 n.7 (1994) (explaining the availability of selective prospective or modified prospective decisions when the Court explicitly declares such a holding). We do not wish to leave any cloud on previously transferred titles that are not before us.[5] We have previously applied our opinions prospectively when policy considerations compelled such a choice. *See Montano v. Gabaldon*, 108 N.M. 94, 96, 766 P.2d 1328, 1330 (1989) (holding that Valencia County's revenue bonds were unconstitutional but applying the holding prospectively so as not to disturb similar, previous bond transactions that had taken place in reliance on a then-accepted understanding of the law); *see also Hicks v. State*, 88 N.M. 588, 592-93, 544 P.2d 1153, 1157-58 (1975) (abolishing common law sovereign immunity prospectively so as to give the legislature opportunity to create a risk management fund and to institute selective statutory sovereign immunity). We also observe that the Attorney

---

[5]We are led to believe that numerous exchanges with public entities have taken place over the years. At oral argument the Land Commissioner suggested that the State Land Office has exchanged land with numerous private parties as well. However, the only private exchange referenced in the Land Commissioner's briefing was the 1983 United Nuclear Corporation exchange, involving less than 500 acres of land and a recent exchange with Easter Seals Santa Maria El Mirador. After oral argument before this Court and supplemental briefing from the parties, Easter Seals Santa Maria El Mirador and Union Pacific Railroad Company submitted a joint amicus curiae brief, asserting they had each consummated private exchanges for small amounts of land with the Land Commissioner. This Opinion has no effect upon any previous exchanges.

General has not sought to challenge the Land Commissioner's authority to engage in any future exchanges with public entities. Accordingly, we express no view on that subject.

**CONCLUSION**

**{90}** The Petitioner's Writ of Mandamus is granted.

**{91}** **IT IS SO ORDERED.**

                                                             _____

                                                             **RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____

**PATRICIO M. SERNA, Justice**

_____

**PETRA JIMENEZ MAES, Justice**

**EDWARD L. CHÁVEZ, Justice (dissenting)**

**CHARLES W. DANIELS, Chief Justice (joining in the dissent)**

**CHÁVEZ, Justice, dissenting.**

**{92}** The Land Commissioner is not simply an auctioneer charged with the responsibility to sell public trust lands. The Commissioner is a trustee of public lands with fiduciary responsibilities to preserve, protect, and manage trust lands so as to make the lands productive for the benefit of the trust beneficiaries to whom he owes an undivided loyalty. The majority has eliminated a seldom used, but occasionally necessary and effective land management strategy available to the Land Commissioner, which can increase the value of the trust corpus and make management of the property more efficient and economical, thereby maximizing the benefit to the trust beneficiaries. Constraining the Land Commissioner's fiduciary responsibilities and the exercise of his discretion exceeds the limits of our power to issue writs of mandamus, and is detrimental to the interests of the trust lands' beneficiaries. Therefore, I respectfully dissent.

**{93}** This Court has repeatedly observed that the writ of mandamus is an extraordinary remedy to be reserved for extraordinary circumstances. To ensure that the writ issues only in extraordinary circumstances, since before statehood this Court has required (1) that a party seeking issuance have no other adequate means to attain the desired relief, and (2) the duty sought to be enforced is clear and indisputable. *Regents of Agric. Coll. v. Vaughn*, 12 N.M. 333, 342-43, 78 P. 51, 53 (1904). Other adequate means do exist to challenge the land

exchanges at issue, including the remedy provided for in the Enabling Act. N.M. Territorial Laws & Treaties, Enabling Act for New Mexico (Act of June 20, 1910, 36 Stat. 557, ch. 310) ("the Enabling Act"). In addition, as is evident from the briefs filed by both the parties and Amici, the Land Commissioner's duty *not* to exchange trust lands for more valuable and productive lands is neither clear nor indisputable. On the contrary, land exchanges that (1) substantially conform to the requirements of the Enabling Act, (2) are consistent with the best interests of the beneficiaries, and (3) comport with the rules adopted by the Land Commissioner are permissible.

**{94}** This mandamus proceeding is also inappropriate because whether the subject land exchanges satisfy these criteria requires the development of a factual record. The Commissioner has asserted that the subject land exchanges have increased the value of the trust corpus by $13,000,000 and have met his objectives to (1) improve boundary distinction for trust lands; (2) consolidate holdings so that the State would own 43,000 contiguous acres (25,000 contiguous on the east side of White Peak and 18,000 contiguous on the west side of White Peak); (3) facilitate effective land management strategies; (4) mitigate trespass, vandalism, theft, illegal vehicle use, and poaching; (5) create a quality game and wildlife area; (6) improve existing roads and construct new, all-weather roads to provide safe access; (7) close unnecessary roads to conserve wildlife habitat; (8) develop campgrounds and facilities for hunters and recreational users; (9) implement forest restoration programs to improve forest health and wildlife habitat. Whether the exchanges did in fact increase the value of the trust corpus and meet objectives that are consistent with the best interests of the trust beneficiaries requires the development of facts. Therefore, those with standing who believe these exchanges are inconsistent with the Land Commissioner's fiduciary obligations may sue in a court of general jurisdiction to void any exchange which does not substantially conform with the requirements of the Enabling Act.

## I.   MANDAMUS IS APPROPRIATE ONLY WHEN THE DUTY AT ISSUE IS CLEAR AND INDISPUTABLE

**{95}** Although a writ of prohibition cannot lie against a state official, *see State ex rel. Bird v. Apodaca*, 91 N.M. 279, 281-82, 573 P.2d 213, 215-16 (1977) ("Prohibition, by its very nature, will not lie against state officers."), mandamus can be used in a prohibitory manner to prohibit unlawful or unconstitutional official action. *See Kiddy v. Bd. of Cnty. Comm'rs of Eddy Cnty.*, 57 N.M. 145, 152, 255 P.2d 678, 683 (1953) ("Public functionaries may be restrained by mandamus from doing what they know is an illegal act."). In considering whether to issue a prohibitory mandamus, we do not assess the wisdom of the public official's act, we determine whether that act goes beyond the bounds established by the New Mexico Constitution. *State ex rel. Clark v. Johnson*, 120 N.M. 562, 570, 904 P.2d 11, 19 (1995).

**{96}** The Constitution and laws of New Mexico define the limits of authority for each branch of government. In 1904, the limits of our authority to issue a writ of mandamus were defined by the Territorial Supreme Court when it wrote "[i]t is said by the highest judicial

32

tribunal in the land that, 'mandamus lies to compel the performance of a statutory duty only when it is clear and indisputable.'" *Vaughn*, 12 N.M. at 342-43, 78 P. at 53 (quoting *Bayard v. United States ex rel. White*, 127 U.S. 246, 250 (1888)). We have never abandoned the requirement of a clear and indisputable duty as essential for the issuance of a writ of mandamus. *Johnson v. Vigil-Giron*, 2006-NMSC-051, ¶ 22, 140 N.M. 667, 146 P.3d 312. Instead, because it is such an extraordinary writ that must be issued only in extraordinary circumstances, we have carefully defined its limits.

> Mandamus is a drastic remedy to be invoked only in extraordinary circumstances. The writ shall not issue in any case where there is a plain, speedy and adequate remedy in the ordinary course of law. It shall issue on the information of the party beneficially interested. [A] writ of mandamus is available only to one who has a clear legal right to the performance sought; it is available only in limited circumstances to achieve limited purposes.

*State ex rel. Coll v. Johnson*, 1999-NMSC-036, ¶ 12, 128 N.M. 154, 990 P.2d 1277 (internal quotation marks and citations omitted).

> While mandamus will not lie to correct or control the judgment or discretion of a public officer in matters committed to his care in the ordinary discharge of his duties, it is nevertheless well established that mandamus will lie to compel the performance of mere ministerial acts or duties imposed by law upon a public officer to do a particular act or thing upon the existence of certain facts or conditions being shown, even though the officer be required to exercise judgment before acting.

*State ex rel. Four Corners Exploration Co. v. Walker*, 60 N.M. 459, 463, 292 P.2d 329, 331-32 (1956) (citations omitted). "A ministerial act is an act which an officer performs under a given state of facts, in a prescribed manner, in obedience to a mandate of legal authority, without regard to the exercise of his own judgment upon the propriety of the act being done." *State ex rel. Perea v. Bd. of Comm'rs of De Baca Cnty.*, 25 N.M. 338, 340, 182 P. 865, 866 (1919). Therefore, our jurisprudence instructs that before we are empowered to issue a writ of mandamus, (1) the boundaries of the duty at issue must be clear and indisputable, (2) the public official must not have discretion in the performance of the duty, and (3) there must not exist another plain, speedy, and adequate remedy in the ordinary course of law.

**{97}** In this case, despite notice to the public as required by the Land Commissioner's rules, 19.2.21.9(D) NMAC, only one bid was received, and no members of the public objected to the bid process. The Attorney General has not filed this mandamus proceeding on behalf of any specific beneficiary who contends that the Land Commissioner breached his fiduciary duty to them by engaging in the subject land exchanges. The Attorney General does not contend that the Land Commissioner failed to comply with the Enabling Act's public notice requirements; failed to open the bidding to all members of the public; engaged

33

in an exchange of trust lands for a value that was less than the true appraised value of the trust lands; or that the exchange will not serve the best interests of the trust beneficiaries by making management of the trust corpus more efficient and economical. Instead, the Attorney General contends that the Land Commissioner did not comply with the public auction requirements because the Commissioner required competing bidders to offer, at a minimum, land with at least the same value as the trust land, and only for all of the trust land the Commissioner proposed to dispose of. These bid requirements, argues the Attorney General, substantially constrained the public auction to achieve a predetermined result. In other words, the Attorney General wants this Court to hold that the Land Commissioner must allow a bidder to bid for trust land in cash, land, other items of value or a combination thereof, and the bidder may also bid on a portion of the land being offered at auction.

**{98}** Thus, the question before us is whether the Land Commissioner has a clear and indisputable duty to allow bidders to offer any and all forms of consideration and on any portion of the land the Commissioner seeks to dispose of in a public auction. As will be discussed, this duty is not clear and indisputable. The Land Commissioner has the discretion to establish the terms of the auction that are in the best interests of the trust beneficiaries. In addition, there are adequate remedies, including the remedy given in Section 10 of the Enabling Act, that authorize an action to enforce the provisions of the Enabling Act and render null and void any "sale, lease, conveyance or contract of or concerning any of the [trust] lands" which are not made in "substantial conformity with the provisions of [the Enabling] act." Enabling Act § 10.

**{99}** Despite the Attorney General's narrow complaints, the majority has raised its own concerns with the auction process and would preclude the Land Commissioner from having any discussions with a potential bidder before the auction and from considering any criteria other than financial criteria. I do not agree that such discussions are precluded. Instead, such discussions will aid the Land Commissioner in defining the best interests of the trust beneficiaries, thus defining a bid's minimum requirements. Any member of the public is still invited to meet or exceed the minimum bid requirement. The Land Commissioner may still be called to answer whether such a bid exceeded the true appraised value of the trust land and whether the bid was in the trust beneficiaries' best interests. When evaluating which is the highest and best bid that is consistent with the trust beneficiaries' best interests, immediate revenue is not the only consideration.

## II. FIDUCIARY DUTIES OF THE LAND COMMISSIONER

**{100}** New Mexico Constitution Article XIII, Section 2 delegates to the commissioner of public lands the responsibility to "select, locate, classify and have the direction, control, care and disposition of all public lands, under the provisions of the acts of congress relating

thereto and such regulations as may be provided by law."[6] To carry out these constitutional responsibilities, the Legislature empowered the Commissioner to "make rules and regulations for the control, management, disposition, lease and sale of state lands." NMSA 1978, § 19-1-2 (1953). *See also State ex rel. Otto v. Field*, 31 N.M. 120, 133, 241 P. 1027, 1032 (1925) ("The commissioner was given ample power to make rules and regulations 'for the control, management, disposition, lease and sale of state lands.'"). On August 5, 1992, the Land Commissioner adopted State Land Office Rule 21, which specifically addresses land exchanges. 19.2.21 NMAC (recodified 12/13/02). The Commissioner is also authorized by statute to "execute and authenticate for the state all deeds, leases, contracts or other instruments affecting" state lands. Section 19-1-2.

**{101}** The New Mexico Enabling Act declares that all lands granted to the State of New Mexico are to be held in trust. 36 Stat. 557, Sec. 10 (1910). "[T]he emergence of the trust concept was originally initiated by the states," and Congress influenced by these practices, "incorporated trust language into the last enabling act that created the states of New Mexico and Arizona." Sean E. O'Day, *School Trust Lands: The Land Manager's Dilemma Between Educational Funding and Environmental Conservation, a Hobson's Choice?*, 8 N.Y.U. Envtl. L. J. 163, 184 (1999) (footnotes omitted). The trust concept arose because although some trust land was lost due to incompetence or corruption, most of the land was lost because states regularly chose to rapidly sell the lands for the purpose of funding schools. Sally K. Fairfax, et al., *School Trust Lands: A Fresh Look at Conventional Wisdom*, 22 Envtl. L. 797, 807 (1992). However, states began to recognize that liquidating trust lands would make sustaining a continuing source of funding difficult. O'Day, *supra*, at 182. As a result, the trend in the states shifted from dissipating the trust lands they had been granted by the federal government to retaining those lands. *Id.* at 181.

> One consequence of this gradual and implicit evolution toward land retention is that the states continue to have a choice regarding whether to sell or retain the lands. Even today, like the federal government, the states continue to engage in land sales and exchanges. Hence, the shift to retention does not imply that no state trust lands will ever be sold, but rather that the presumption is in favor of retaining rather than disposing of the lands.

Fairfax, *supra*, at 824 & 824 n.93 (footnotes omitted) ("State trust land managers tend to maintain a portfolio of lands for investment and management purposes. . . . All states except California engage in land exchanges to block in their scattered sections. Oregon and Arizona have moved particularly effectively in this direction.").

---

[6]New Mexico Constitution Article XXIV, Section 1 reserves unto the Legislature the authority to specify the terms and conditions of leases and contracts reserving a royalty to the State from minerals, geothermal steam, and waters on lands confirmed to the State by the act of Congress of June 20, 1910 (the Enabling Act).

**{102}** New Mexico has interpreted the trust language in the Enabling Act as creating a charitable trust with the beneficiaries comprised of the citizens of New Mexico. *Forest Guardians v. Powell*, 2001-NMCA-028, ¶¶ 9-10, 130 N.M. 368, 24 P.3d 803. However, the Land Commissioner's undivided loyalty is to the designated beneficiaries and not the State as a whole. *State ex rel. Shepard v. Mechem*, 56 N.M. 762, 770, 250 P.2d 897, 902 (1952) (funds from lands granted by the Enabling Act may not be used to defray general government expenses). In *Ervien v. United States*, 251 U.S. 41, 48 (1919), the United States Supreme Court held that the New Mexico Land Commissioner could not expend money derived from the sale of trust lands to promote the state. The Court reasoned that "[t]here is in the Enabling Act a specific enumeration of the purposes for which the lands were granted and the enumeration is necessarily exclusive of any other purpose." *Id.* at 47; *see also Lassen v. Arizona ex rel. Arizona Highway Dep't*, 385 U.S. 458, 468 (1967) ("the purposes of Congress require that the Act's designated beneficiaries 'derive the full benefit' of the grant" (citation and footnote omitted)); *Cnty. of Skamania v. State*, 685 P.2d 576, 580 (Wash. 1984) (en banc) ("A trustee must act with undivided loyalty to the trust beneficiaries, to the exclusion of all other interests."). The beneficiaries of the trust lands at issue are identified as the public schools in New Mexico, New Mexico State University, Las Vegas Medical Center, New Mexico Military Institute, New Mexico Tech, New Mexico School for the Deaf, the State Penitentiary, Miners' Colfax Medical Center, the School for the Blind, and charitable and penal reform.

**{103}** The Commissioner is subject to the same fiduciary obligations as any private trustee. *Cnty. of Skamania*, 685 P.2d at 580. "All powers of trusteeship are held in the trustee's fiduciary capacity and must be exercised in good faith and to serve the interests of the beneficiaries." Restatement (Third) of Trusts § 86, cmt. b (2007). A trustee's duties include the protection and management of the trust property to provide returns or other benefits to the trust, *id.* § 76; duty of prudence, *id.* § 77; and loyalty, *id.* § 78. To carry out these duties, the Commissioner must decide whether it is better for the trust beneficiary to sell the lands and invest the receipts or retain and manage the lands. When the Commissioner retains and manages trust lands, he must also be concerned about the allocation of personnel and management resources to make the land productive, maintain fences and roads, prevent overgrazing, control soil erosion, minimize trespass damage and the risk of fires, and enhance wildlife habitat, among other duties. The benefit to the trust is maximizing revenues and profits while minimizing the costs incurred to manage the property. Accordingly, the Commissioner should have the flexibility to manage the land in a manner that enhances the opportunity for the largest return consistent with the beneficiaries' objectives. The objectives of the beneficiaries can hardly be said to be the consumption of the entire trust corpus.

**{104}** The flexibility required to manage the land necessarily calls for the exercise of discretion consistent with the terms and purpose of the trust or as required by the exercise of the trustee's fiduciary duties. *Id.* § 87. A court should not interfere with a trustee's exercise of a discretionary power when that exercise is reasonable and consistent with the trust purposes and the trustee's fiduciary duties. *Id.* The purpose of the Enabling Act is to

prevent the sale of land at unreasonably low prices. *Lassen*, 385 U.S. at 464. Indeed, written into Section 10 of the Enabling Act is the requirement that no sale or other disposal of trust property be made for a consideration less than the true appraised value of the trust property. *Id*. Thus, one of the express purposes of the Enabling Act is to obtain the fair market value of the property being sold. *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 637 (10th Cir. 1998).

**{105}** We have held that the Land Commissioner has broad discretion to decide the policy question of how he or she will offer trust lands for sale and the quantity of land to sell. *Stovall v. Vesely*, 38 N.M. 415, 418-19, 34 P.2d 862, 864-65 (1934) (citing *Field*, 31 N.M. at 149-50, 241 P. at 1039).

> "It seems to us that this language is in accord with our view that, under the Enabling Act, Constitution, and statutes of New Mexico, the commissioner may sell or hold the state lands as his judgment and discretion may dictate, and that he may exercise 'entire discretion as to the time of selling these lands and the extent to which they should be sold,' and that no one has the right to compel the commissioner to sell the lands in its [sic] entirety or otherwise, and that, if he elects to sell the land otherwise than in its entirety, he is within his jurisdiction to do so. To hold otherwise would lead to an absurd result. * * * As we have seen, the commissioner was given almost unlimited power with respect to the public lands owned by the state 'except as may be otherwise specifically provided by law.' * * * Nowhere in the statute is any provision made for any supervisory control over the acts of the commissioner excepting in the case of contest concerning lands when an appeal may be taken from the decision of the commissioner to the district court. He is responsible alone to the electorate for any lack of proper business capacity or any misdoings in office."

*Id.* at 419, 34 P.2d at 864-65 (quoting *Field*, 31 N.M. at 150-56, 241 P. at 1039-41).

**{106}** The *Field* Court's interpretation of the broad discretion enjoyed by the Commissioner is consistent with that of other jurisdictions. *See Campana v. Arizona State Land Dep't*, 860 P.2d 1341, 1344 (Ariz. Ct. App. 1993) (land commissioner can establish the terms of sale that are in the trust's best interests and has discretion as to how to structure the proposed sale); *Pike v. State Bd. of Land Comm'rs*, 113 P. 447, 454-55 (Idaho 1911) (commissioner did not abuse discretion in advertising for auction 24,000 acres of land without allowing bids for smaller parcels); *Big Island Small Ranchers Ass'n v. State*, 588 P.2d 430, 437 (Haw. 1978) (commissioner did not abuse his discretion by auctioning 42,000 acres of land at one time). In addition, when a power is granted by statute, everything necessary to carry out the power will be implied. *Kennecott Copper Corp. v. Emp't Sec. Comm'n*, 78 N.M. 398, 402, 432 P.2d 109, 113 (1967). This Court has held that the general power granted to the Land Commissioner should not be limited by implication unless its exercise would interfere with, frustrate, or to some extent defeat the purpose for which the power was granted. *Field*, 31

N.M. at 154, 241 P. at 1041 (internal quotation marks and citation omitted).

## III.    ALL PARTIES AND AMICI AGREE THAT THE ENABLING ACT DOES NOT EXPRESSLY PRECLUDE LAND EXCHANGES

**{107}**    Section 10 of the Enabling Act does impose upon the Commissioner certain non-discretionary obligations.  The trust lands must be appraised at their true value, the money or other things of value obtained from the disposition of the lands must be used for specified purposes, and the consideration received must at least equal the true appraised value of the trust lands.  Section 10 also imposes certain duties on the Commissioner with respect to the sale or lease of trust lands.  The lands must be sold at a public auction to the highest and best bidder, with specific requirements for public notice of the auction.  There must also be a true value appraisal of the lands and the lands cannot be sold for less than the appraised value or the minimum price fixed in the Enabling Act.  36 Stat. 557, § 10 (1910).  However, none of the restrictions in the Enabling Act expressly or implicitly forbid the Commissioner or the State from exchanging land.  Indeed, the parties to this case and Amici do not contend that the Enabling Act imposes a clear and indisputable duty on the State not to exchange trust lands.

**{108}**    On the contrary, the Attorney General himself states that "[n]either the Enabling Act nor other authorities expressly provide for or prohibit the acceptance of land as consideration in a sale of State Trust Lands."  In fact, the Attorney General issued two competing opinions on this subject, one in 1988 suggesting that a land exchange was not permissible, and a second one overruling that opinion in 1991, making it clear that land exchanges are permissible.  In his 1991 opinion, the Attorney General stated "[t]he authority of the Commissioner to 'dispose' of public lands granted by the New Mexico Constitution and, with restrictions, by the Enabling Act includes the power to exchange public lands."  N.M. Att'y Gen. Op. 91-15 (1991), *overruling* N.M. Att'y Gen. Op. 88-35 (1988).  The Attorney General conceded as much during oral argument.  He was asked, "Are you saying that the Commissioner cannot exchange for land, period?"  His response was an unequivocal "No, absolutely not."  Expanding on the discussion, the Attorney General stated "Our position is that there's a limited, narrow authority to do land exchanges under existing law, and that authority exists in those cases where you can hold a meaningful public auction."  Regarding whether the current Attorney General agreed with the Attorney General who wrote the 1991 opinion, during oral argument the present Attorney General said that he "fundamentally agreed with the conclusions of that opinion."  The Attorney General also did not challenge the Commissioner's authority to accept public or private land in exchange for trust lands.

**{109}**    Amicus Curiae New Mexico School for the Blind, relying on the Enabling Act, the New Mexico Constitution, and New Mexico case law, argues that exchanges are clearly permitted.  Amicus Curiae University of New Mexico, relying on the Enabling Act and standard rules of statutory construction, argues that the plain language of the Enabling Act authorizes land exchanges.  Amicus Curiae Easter Seals and Union Pacific Railroad Company also conclude that the Enabling Act does not forbid land exchanges.  Amicus

Curiae New Mexico Wildlife Federation and the National Wildlife Federation do not argue that the Enabling Act clearly and indisputably forbids land exchanges; they simply urge this Court not to address the legality of land exchanges between the Commissioner and state or federal governmental entities. This suggested approach is not helpful because the Enabling Act does not distinguish between the disposition of trust lands to private or public parties. The only reference to the exchange of lands from the federal government is in the last paragraph of Section 10, where an exchange of state land for consideration of less than or equal to the appraised value of the state land is permissible. This would imply that other land exchanges are permissible so long as they are for consideration equal to or greater than the appraised value of the state land.

## IV.   THE ENABLING ACT ALLOWS LAND EXCHANGES

**{110}**   However, there is other language in Section 10 that can reasonably be interpreted to allow land exchanges. The second paragraph of Section 10 provides, in part, that

> [d]isposition of any of said lands, or of any money *or thing of value directly or indirectly derived therefrom*, for any object other than that for which such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this act, shall be deemed a breach of trust.

(Emphasis added.) A "thing of value" derived from the disposition of land could quite clearly encompass land received in consideration for the disposition of the trust lands. The inclusion of money in the sentence also implies that consideration other than money may be accepted in the disposition of land.

**{111}**   This last point is corroborated in the fourth paragraph of Section 10, which reads in part: "All lands, leaseholds, timber and other products of land before being offered shall be appraised at their true value, and no sale or other disposal thereof shall be made for a consideration less than the value so ascertained." Two observations can be made about this language. First, the language pertains to the "sale or other disposal" of lands, leaseholds, timber and other products. Second, the language refers to "consideration," not just money. In *Field*, 31 N.M. at 144, 241 P. at 1037, this Court acknowledged the obvious--the expression "dispose of" is not synonymous with the word "sell."

> It will be noted under the provisions of our Constitution the lands may be held or disposed of. In the language of the Supreme Court of the United States . . . . The expression "to dispose of" is very broad, and signifies more than "to sell." Selling is but one mode of disposing of property. . . . And again, it is said that, when a contract respecting property contains an agreement to be performed by the owner of it when he shall "dispose of" or "sell" it, it is obvious that the words "dispose of" are not synonymous with the word "sell"; and their meaning must be determined by considering the

39

remainder of the contract.

*Id.* (internal quotation marks and citations omitted).

**{112}** Although the majority concludes that the phrase "disposal thereof" refers to "leasehold," Maj. Op. ¶ 38, the seventh paragraph of Section 10 suggests that the Commissioner may do more than sell or lease the land. The seventh paragraph reads, in pertinent part: "Every *sale, lease, conveyance or contract of or concerning any of the lands* hereby granted or confirmed, or the use thereof or the natural products thereof, not made in substantial conformity with the provisions of this act shall be null and void." (Emphasis added.) If the Commissioner were limited to selling or leasing trust property, then why would Congress refer to other conveyances or contracts concerning the trust properties? Why would the Legislature mandate the Commissioner to "make rules and regulations for the control, management, *disposition, lease and sale* of state lands" and authorize the Commissioner to "execute and authenticate for the state all *deeds, leases, contracts or other instruments affecting such lands"*? Section 19-1-2 (emphasis added). Why would the New Mexico Constitution specify that the Commissioner "shall select, locate, classify and have the direction, control, care and disposition of all public lands"? N.M. Const. art. XIII, § 2. We do not interpret statutes in a way that renders language superfluous. *Lion's Gate Water v. D'Antonio*, 2009-NMSC-057, ¶ 29, 147 N.M. 523, 226 P.3d 622.

**V.  THE COMMISSIONER'S PUBLIC NOTICE AND PUBLIC AUCTION REQUIREMENTS FOR A LAND EXCHANGE SUBSTANTIALLY CONFORM WITH THE PROVISIONS OF THE ENABLING ACT**

**{113}** I am of the opinion that the Enabling Act may be reasonably construed to allow land exchanges, provided that (1) the exchange is for land with a value at least equal to the value of the trust lands, and (2) the exchange is consistent with the best interests of the trust beneficiaries. I am also of the opinion that the exchange may take place without a public auction, since the third paragraph of Section 10 reads "lands shall not be sold or leased . . . to the highest and best bidder at a public auction," not "lands shall not be sold, leased *or otherwise disposed of* . . . to the highest and best bidder at a public auction." Nevertheless, the Commissioner's rules pertaining to land exchanges closely follow the sale requirements in the Enabling Act. Specifically, the rules require an appraisal of the true value of the lands proposed for exchange and public notice, and the public at large is invited to submit competing proposals. 19.2.21.8(C) NMAC; 19.2.21.9(D) NMAC. A competitive selection process for land exchanges is required. 19.2.21.2 NMAC.

**{114}** The specific questions raised by the Attorney General in his petition for writ of mandamus are whether the subject land exchanges comply with the public auction requirement when the Commissioner required bids composed of land with a value equal to the true fair market value of the trust lands and also required bidders to bid on all of the trust lands being offered. The questions raised by the Attorney General are answered by *Field* and *Vesely*. In those cases, we made it clear that "no one has the right to compel the

commissioner to sell the lands in its [sic] entirety or otherwise, and that, if he elects to sell the land otherwise than in its entirety, he is within his jurisdiction to do so." *Field*, 31 N.M. at 151, 241 P. at 1039; *Stovall*, 38 N.M. at 418-19, 34 P.2d at 864-65. Just as the Commissioner may decide when to sell or how much land to sell, he or she is the one to decide the terms and conditions that would be in the best interests of the trust beneficiaries.

> [I]t may not be doubted that the Legislature of 1912, in creating the state land office, intended that the commissioner should exercise the power theretofore reposed in the commissioner of public lands to use his discretion in making deeds, contracts, and grants upon such terms and conditions as he may deem for the best interests of the state.

*Field*, 31 N.M. at 164, 241 P. at 1044.

**{115}** In this case, the Commissioner offered a specified quantity of trust lands for land with a value at least equal to the true appraised value of the trust lands. However, a bidder was not precluded from offering a cash bonus. I fail to understand why we would yield to the Attorney General's demand when it is the Land Commissioner who has the fiduciary duty regarding our trust lands. The Attorney General seeks to protect the best interests of the bidders, not the best interests of the trust beneficiaries.

**{116}** The majority raise concerns in addition to those expressed by the Attorney General. The majority conclude that it is not a public auction if the Commissioner has pre-public auction discussions with a bidder and the Commissioner is limited to accepting the greatest financial return when deciding what is the "highest and best bid." Instead of analyzing the Commissioner's duties through the lens of his fiduciary responsibilities to the trust beneficiaries, the majority analyze his responsibilities as if he or she were simply an auctioneer.

**{117}** When scrutinized through the lens of the Commissioner's fiduciary obligations, the Commissioner has discretion to enter into pre-auction discussions and to determine which is the highest and best bid. The Commissioner has established a detailed procedure for land exchanges in Rule 19.2.21.8(A) NMAC with the "best interests of the trust" the watchword. The Commissioner may have "preliminary informal discussions or other preliminary communications with potential exchange applicants prior to any exchange application or exchange proposal being submitted and prior to any publication soliciting exchange proposals." 19.2.21.9(A) NMAC. Only after an application is filed and "the commissioner determines that the proposed exchange appears to offer sufficient benefit to the trust and an advertisement soliciting proposals for the exchange has not already been published, the commissioner shall cause an advertisement soliciting further exchange proposals to be published." 19.2.21.9(B)(6) NMAC. Within a reasonable time after the published closing date, the Commissioner "may select the proposal or proposals he determines are the highest and best, that is, the proposal or proposals that he believes will be most beneficial to the trust in accordance with the standards set forth in Subsections A and C of 19.2.21.8 NMAC

41

above, and reject the rest." 19.2.21.10(A) NMAC. He is not obligated to accept the proposal of the party who initially applied for the land exchange. Instead, the initial land exchange proposal is what informs the Commissioner regarding the minimum standards for the public auction. In the final analysis, the Commissioner may decide that it is not in the best interests of the trust beneficiaries to accept any bid, in which case he may reject all bids. 19.2.21.10(A) NMAC.

**{118}** The majority has declared this procedure invalid. Maj. Op. ¶ 70. I am more persuaded by the following analysis of the Hawai'i Territorial Supreme Court in *Fasi v. King*, 41 Haw. 461, 1956 WL 10320 (1956).

> So, in this case, a situation is presented where a prospective purchaser states to the commissioner that it desires to purchase a parcel of land which in location and area is suited for a particular type of use that it is contemplating and that it is willing to make improvements thereon of specified minimum cost. The commissioner determines that the proposal is in the interest of the development of the area in which the land is located. She makes a decision to offer the land for sale. The board of public lands agrees. *The decision is not that the sale be made to this prospective purchaser. The decision is that here is a proposal for improvement which is in the interest of the development of the area; here is a prospective purchaser who is willing to meet the minimum standard of improvement which is deemed desirable by the commissioner and the board; there may be other prospective purchasers who may be willing to exceed that standard; so let the Territory offer the land for sale with conditions to assure that at least that minimum standard will be met.*

*Id*. at 468 (emphasis added). Pre-auction discussions will assist the Commissioner in determining the minimum standards that will help him or her develop new and profitable strategies that are consistent with enhancing the trust corpus and honoring the best interests of the trust beneficiaries. The public auction itself will permit the public to exceed the minimum standards, thus giving rise to the highest and best bid.

**{119}** In this case, the Commissioner asserts that the land exchange will increase the value of the trust corpus by $13,000,000 and make management of the land more efficient and economical. Advertising these minimum standards seems to me to be consistent with the Commissioner's fiduciary obligations. Certainly other minimum standards will shrink the universe of minimum bidders, yet we would not declare such minimum standards to be invalid. For example, in leasing lands for grazing, the Commissioner might insist on the bidder having specified minimum levels of competence, such as range management experience or education in order to ensure a level of competence that will help protect the land from overgrazing, soil erosion, damage to streams, and other damage. These management strategies are better left to the Commissioner's discretion. His position is not

apolitical. Because he is an elected official, the pressures of the general public may very well influence his management strategies. However, we should not interfere with his discretion when the exercise of that discretion is proven to be in the trust beneficiaries' best interests.

**{120}** With respect to the highest and best bid, immediate revenue is not the sole consideration in determining the trust beneficiaries' best interests. *Campana*, 860 P.2d at 1344. The requirement of a highest and best bid is not for the bidders' benefit; it is for the benefit of the trust beneficiaries. *Bancamerica-Blair Corp. v. State Highway Comm'n*, 95 S.W.2d 1068, 1070-71 (Ky. Ct. App. 1936), *superseded by statute on other grounds as stated in Pendleton Bros. Vending, Inc. v. Commonwealth Finance & Admin. Cabinet*, 758 S.W.2d 24 (Ky. 1988). However, because the consideration for the land is not limited to money, the Commissioner must exercise judgment to determine whether the bids would advance the interests of the trust and its beneficiaries. *See Brown v. City of Phoenix*, 272 P.2d 358, 363-64 (Ariz. 1954). As minimum security to the trust beneficiaries, the Enabling Act requires that the trust lands be appraised at their true value, and the consideration received must at least equal that appraised value. Enabling Act § 10. If in addition to obtaining consideration with at least equal the true appraised value of the trust lands the Commissioner is able to reduce the expense of land management and prevent the destruction of the trust property, one cannot contend that the Commissioner has breached his fiduciary duty. In addition, the concerns expressed by Congress when enacting the Enabling Act will have been allayed, since the land will not have been disposed of for less than its fair value.

## VI. VOTER REJECTION OF A CONSTITUTIONAL AMENDMENT DOES NOT DEFINE THE STATUS QUO

**{121}** The majority finds significant to its analysis the 1990 voter rejection of an amendment to the Enabling Act. Maj. Op. ¶ 9. The proposed amendment sought to "*clarify* the authority of the Commissioner of Public Lands to exchange lands under his control." The fact that the electorate rejected the amendment does not define the status quo; we must still interpret existing law. Law is not made by defeating bills or constitutional amendments. *State ex rel Udall v. Pub. Employees Ret. Bd.*, 118 N.M. 507, 512, 882 P.2d 548, 553 (Ct. App. 1994), *rev'd on other grounds*, 120 N.M. 786, 907 P.2d 190 (1995). Rejection of legislation does not offer any insight into the meaning of existing law. *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969) ("unsuccessful attempts at legislation are not the best of guides to legislative intent"); *Ingersoll v. Palmer*, 743 P.2d 1299, 1318 (Cal. 1987) ("We can rarely determine from the failure of the Legislature to pass a particular bill what the intent of the Legislature is with respect to existing law.")*; State ex rel. Douglas v. Beermann*, 347 N.W.2d 297, 305 (Neb. 1984). I am not persuaded that the popular vote is significant to the analysis in this case.

**{122}** History teaches us that the rejection of an amendment does not define the limits of the law. For example, the Child Labor Constitutional Amendment, which would have authorized Congress to limit, regulate, and prohibit the labor of persons under eighteen years

of age, was never ratified. Yet the Fair Labor Standards Act has provisions designed to protect the educational opportunities of youth, prohibit their employment in jobs that are detrimental to their health and safety, and restrict the hours that youth under sixteen years of age can work. Fair Labor Standards Act of 1938, 29 U.S.C. § 212 (1974). The constitutionality of the Fair Labor Standards Act has been upheld. *United States v. Darby*, 312 U.S. 100 (1941). The Equal Rights Amendment, which provided that "[e]quality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex," was never ratified. Yet the Civil Rights Act of 1964 forbids discrimination on account of gender.

**{123}** Finally, if indeed the 1990 popular vote rejecting amendment of the Enabling Act is as significant as the majority suggests, then why has the majority declined to follow the will of the people during that same election when they declined to validate, ratify, and confirm all exchanges completed by the Land Commissioner before January 1, 1990? If I were persuaded that the Commissioner has a clear and indisputable duty not to engage in land exchanges, I would enforce the Enabling Act as written and declare the land exchanges void. I cannot agree that this Court has the authority to apply its holding prospectively when the Enabling Act itself provides that "[e]very sale, lease, conveyance or contract of or concerning any of the lands hereby granted or confirmed . . . not made in substantial conformity with the provisions of this act shall be null and void." Enabling Act § 10.

**{124}** For the foregoing reasons, I respectfully dissent.

_____
**EDWARD L. CHÁVEZ, Justice**

**I CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**

**Topic Index for *State of N.M. ex rel. King v. Lyons*, Docket No. 32,197**

| AE | APPEAL AND ERROR |
|---|---|
| AE-AJ | Appellate Jurisdiction |

| CP | CIVIL PROCEDURE |
|---|---|
| CP-QL | Questions of Law and Questions of Fact |
| CP-RT | Retroactivity |
| CP-WR | Writ of Mandamus |

| CT | CONSTITUTIONAL LAW |
|---|---|
| CT-AM | Amendment to Constitution |

| | |
|---|---|
| CT-CG | Constitutional Law, General |
| CT-NM | New Mexico Constitution, General |
| | |
| **GV** | **GOVERNMENT** |
| GV-LU | Land Use |
| GV-PF | Public Funds |
| GV-PL | Public Lands |
| GV-SA | State Agencies |
| | |
| **JD** | **JURISDICTION** |
| JD-AJ | Appellate Jurisdiction |
| JD-SC | Supreme Court |
| | |
| **PR** | **PROPERTY** |
| PR-LG | Land Grants |
| PR-PU | Public Lands |
| | |
| **RE** | **REMEDIES** |
| RE-EO | Extraordinary Writs |
| RE-EC | Exclusive Remedy |
| RE-WM | Writ of Mandamus |
| | |
| **ST** | **STATUTES** |
| ST-IP | Interpretation |
| ST-LI | Legislative Intent |
| ST-RC | Rules of Construction |